McCARTEE, appellant, *vs.* TELLER and wife, respondents.

Where *marriage articles* were entered into with a female, *an infant,* not conveying an estate of freehold to secure the settlement, but making provision for the payment of an annuity, after the decease of the husband, to the wife *during widowhood;* which articles, after the decease of the husband, were considered as *invalid,* by reason of the *infancy* of the wife at the time of the entering into the same as well by the *widow* as by the *executor* to whom the estate of the husband was devised in trust, and the latter, upon the assumption of the invalidity of the marriage articles for several years paid the *one third* of the rents, issues, and profits of the estate to the widow *as and for her dower,* and by other acts acknowledged her right of dower; *it was held,* upon his subsequently refusing, after the re-marriage of the widow, to pay over the one third of the rents, &c. that he was concluded by his acts, and an *account* of the monies received by him was directed to be taken and stated by a master.

Whether a provision made by a marriage settlement, to continue only *during widowhood,* allowing the *non-age* of the wife to be no objection, is such a provision as to entitle the party representing the heir to set it up as an *equitable bar* to a demand of dower, *quere.* Upon this point, *see* the *opinions* of the CHANCELLOR in the court of chancery, and of Mr. Justice NELSON in the court for the correction of errors.

In this case, *marriage articles,* or an *ante-nuptial contract,* was entered into between *Philip Jacobs* of the one part, and *Elizabeth Brown,* an *infant,* acting

ALBANY,
Dec. 1831.

McCartee
v.
Teller.

with the approbation and assent of her guardian, of the other part. By the articles, the husband covenanted, that after his death, out of his estate, his heirs, &c. should pay to the wife $1200 annually, *for so long a time as she should remain his widow*, and in case of her re-marriage, that $1000 should be paid to her; which sums were declared to be settled on her *in lieu of dower*, and were agreed to be paid upon the *condition* that the wife should remain chaste, and that she should not contract a debt above $20, without the knowledge and consent of her husband. Nineteen months after the marriage, the husband made his will, bequeathing to his wife $6000, to be received by her at her election, *in lieu of dower* and also *in lieu of all claims*, under the marriage articles—she to signify her election in 30 days. The husband died in October, 1818. Two of the executors and trustees, one of whom was a counsellor at law, were of opinion that the marriage articles were *invalid*, by reason of the *infancy* of the wife at the time of the execution of the same, and that she therefore was *entitled to dower* in the real estate of her husband, which opinion was communicated to the wife, and she, by agreement with the *acting executor*, cancelled the marriage articles in her possession, and gave notice within the thirty days specified in the will, that she *elected to take her dower*. The acting executor then commenced to pay to her, and continued to pay to her and to her second husband, she having married again in February, 1821, the *one third* of the rents, issues and profits of the real estate, as and for her dower in such estate, until the 1st November, 1821, when, having been advised that the marriage articles were binding, notwithstanding the *non-age* of the wife at the time they were entered into, he refused to make any further payments, alleging that the articles were a *bar* to the right of dower, and that by the second marriage the widow had *forfeited* the provisions made for her by the same. The widow and her husband thereupon filed a bill in chancery, praying that the executor might account for, and pay over to them the *one third of the rents*, &c. received by him, and that a *receiver* might be appointed to receive the *one third* of such rents as should thereafter become due. In addition to the above facts it appeared by the pleadings and proofs, that after the death of Jacobs, and previous to the 1st November, 1821, the acting executor had united with the widow in various applications to the chancellor respecting the management of the estate in which the *right to dower* was asserted, and that such executor had paid to the widow a sum in gross, *in lieu of dower*, in certain property taken by the corporation of New-York for a street, the value of which had been paid to him. The cause was heard before the *vice-chancellor* of the first circuit, who *decreed* an account, and ordered a reference to a master to take and state the same; the decree thus made was affirmed by the *chancellor* on appeal to him, and by the *court for the correction of errors* on appeal from the decision of the chancellor. For the reasons given in the several courts in support of the several decisions, *see* the opinions of the VICE-CHANCELLOR, of the CHANCELLOR, and of *Senator* ALLEN.

APPEAL from chancery. Pierce Teller and Elizabeth his wife filed their bill in chancery against Peter McCartee, for an account of monies received by him as the agent or receiv-

er of Mrs. Teller, of the dower or thirds belonging to her, as the widow of Philip Jacobs, in the real estate whereof her late husband died seised. On the 10th February, 1817, Philip Jacobs and Elizabeth Brown (now Elizabeth Teller) were married. Four days previous to the marriage an *ante-nuptial contract* was entered into between them, (the female being a *minor* of the age of 20 years and three months, acting with the consent and approbation of a *guardian* of her person and property, duly appointed,) whereby, after stating that the parties had agreed to the solemnization of a marriage between them, Jacobs covenanted that after his death, and out of his estate, his heirs, executors and administrators should pay to his intended wife the sum of $1200 annually *for so long a time as she should remain his widow;* and also, that his executors should at his death give unto her all the household furniture, and one set of plate to her *and her heirs and assigns forever*—in case of her re-marriage, the sum of $1000 to be paid to her; which said sums, and household furniture and set of plate, were declared to be settled on her *in lieu of all dower*, right, title or claim of dower which she might acquire by her marriage with Jacobs—with which provisions she declared herself satisfied and contented. The contract then proceeded to state that the said $1200 per annum, the $1000 in case she should re-marry, the household furniture and plate, were agreed to be given *upon the express condition* that the said Elizabeth should remain and continue chaste, and that she should not contract any debt above the sum of $20, without the knowledge and consent of Jacobs, and for which he might be made accountable; and that upon breach of the conditions, she should not be entitled to the benefit of those provisions. Jacobs died on the 6th October, 1818. On the 23d January, 1819, the widow of Jacobs was delivered of a daughter, who lived until the 5th April, 1821, when she also died. Previous to the death of Jacobs, to wit, on the 7th September, 1818, he made his *last will and testament*, whereby, after giving legacies to a number of persons, he inserted a bequest in these words: *Item.* I do hereby bequeath to my beloved wife Elizabeth the sum of $6000, to be received by her *in lieu of dower*, to which she might be by law entitled out of my real estate,

and also *in lieu of all claims* on her part, under certain marriage articles duly executed previous to my intermarriage with her, and should the said Elizabeth be willing to receive the said sum of $6000 in lieu of her dower and of her claims under said articles, I do hereby direct, that previous to payment thereof by my said executors, the said Elizabeth do, in conjunction with my said executors, cancel the said marriage articles, and execute such release of her right to dower out of my real estate, as counsel learned in the law may devise or advise; and it is further my will, that my said wife make her election to take under this my last will and testament, or under said marriage articles, in 30 days after she may receive notice of this bequest after my decease." He then directed, that if at the time of his decease there should be a child of his alive, all the rents and profits of his *real estate* should be applied to its support, &c. until such child attained the age of 21, or married, and the surplus be invested in stocks for the benefit of the child, to be paid at the age of 21, or on marriage. Next, he devised and bequeathed all the rest, residue and remainder of his *estate, real and personal,* to the Orphan Asylum Society in the city of New-York; the bequest to take effect immediately, if he should leave no child at the time of his death, or if he did leave a child, then upon the death, intermarriage or the attaining of the age of 21 by such child. Upon the back of this devise followed another, whereby the testator devised unto his *executors,* or such of them as might act, *all his real estate,* of whatsoever nature or kind, subject to the trusts aforesaid. Then followed a direction, that whenever such child should attain the age of 21, or marry, that his real estate should be sold by his executors, and the *one half of the proceeds* paid to the child, if the child should attain the age of 21 years, or marry, concluding with the appointment of Peter McCartee, (the appellant,) R. Cunningham and J. Anthon as executors and trustees of the will. Two of the executors, one of whom was a counsellor at law, were of opinion that the marriage articles were invalid by reason of the infancy of the wife at the time of the making and entering into the same, and that she therefore was entitled to dower in the real estate of her husband, which opinion was communicated to the wife, where-

upon, by agreement with the acting executor, she cancelled
the marriage article in her possession, and give notice within
the 30 days specified in the will that she elected to take her
dower. Jacobs died seised of a valuable real estate situate
in the city of New-York, and was in the receipt of rents
accruing from the same, amounting annually, exclusive of cer-
tain property in *Fayette street*, to the sum of $4000. On the
17th March, 1819, the widow presented a petition to the chan-
cellor, stating that she had *elected to receive her dower* instead of
the sum given by the will, and praying an order for the go-
vernment of the executors as to an allowance for the nurture
and maintenance of her child, and for expenses incurred in the
maintenance of the household since the death of her husband,
in which petition *McCartee* and one other of the executors
united by a statement of facts subjoined thereto ; upon which
petition, the chancellor made an order that the widow be al-
lowed the used of the mansion house, then occupied by her,
until the first day of May then next, *free of rent*, and that the
executors pay her $500 annually for the nurture and mainten-
ance of the child. The property in *Fayette street* was taken
by the corporation of New-York in the opening of a street,
and the sum of $5215 paid therefor to *McCartee*, the appel-
lant; whereupon the widow presented another petition to the
chancellor, claiming to be entitled to a portion thereof, as her
*right of dower* in the property thus taken was extinguished, in
which petition the executors again joined, and the chancellor,
on the 17th June, 1820, made an order that the widow should
be paid the interest of *one third* of the sum received by
McCartee *in lieu of her right of dower*. Afterwards, on the
31st August, 1821, McCartee paid to the respondents (who
had intermarried on the 21st February, 1821,) $1484,50 as a
compensation *for the claim of dower* of Mrs. Teller in the
property taken by the corporation, and took their release. In
relation to the *rents, issues and profits of the real estate,*
whereof Jacobs died seised, the appellant, in his answer, ad-
mitted that he had collected and revised the same up to the 1st
November, 1828, and that he had paid and accounted quarter
yearly to the widow of Jacobs, and to her husband, Teller, for
*one third of such rents, as and for her dower* in such real

estate, from the death of Jacobs, to and including the quarter ending on the 1st November, 1821 ; that he had done so under the belief that the widow was entitled to dower in the real estate of Jacobs, having been so advised by one of his co-executors a counsellor at law, but he averred that in November, 1822, he was advised by other counsel that the *articles of marriage and settlement* entered into previous to the marriage, were valid and binding upon Mrs. Teller, and that she had no right of dower in the real estate of Jacobs, and that relying upon such advice so last obtained, corroborated by the opinions of other eminent counsel, he had refused, and still refuses to account to Mrs. Teller, or her husband, for any portion of the rents or profits of the real estate, on account of her claim of dower therein. The bill charges, that the appellant *advised* the widow, previous to her election, to take her *dower*, to make such election, which is denied by the answer, but established by the proofs ; but from such evidence it also appears that the guardian of the widow, who is a counsellor at law, gave the same advice. It further appears, that when formal notice of the election to take her dower was given to the executor by the guardian of Mrs. Teller, a conversation was had between them as to the necessity of cancelling the marriage articles. *McCartee* said it was not necessary ; that the articles either were destroyed, or that he would destroy them, and that Mrs Jacobs or the guardian might destroy the counterpart in her possession. Which conversation was communicated to Mrs. Jacobs, and she thereupon tore it up, in the presence of the guardian.

The case was heard by the *Vice Chancellor* of the first circuit, who held, that the marriage settlement was *not valid,* because in it there was no covenant which would enable the court to compel the *heirs* to make such provision as the statute relative to *jointures* requires. He was also of opinion that the condition that the wife *should not contract any debt* over $20, without the knowledge or assent of her husband, was unreasonable. And he further held, that the admission of the right of dower by the executor, and the assignment and payment of the one third of the rents to her, entitled her to such rents, and therefore *decreed* an account. *See* the opinion of the vice chan-

cellor, 2 Paige's Ch. R. 517 to 520. From this decree the defendant, M'Cartee, appealed to the Chancellor, who admitted that an *infant* is bound at law by a legal jointure, and that in equity, in analogy to the legal rule, an infant may be barred by an *equitable jointure*, settled upon her before marriage, by the consent, and approbation of her parents or guardians; he also admitted, that by the contract the husband had made the annuity settled upon his wife an *equitable charge* upon the real estate whereof he should die seised and possessed; but he *held*, that as the annuity was limited to *the widowhood of the infant*, and had not been accepted by her since the removal of her disability to contract or assent, the marriage articles could not be set up as an equitable bar. He was also of opinion, under the circumstances of this case, that the executor having substantially assigned to the widow the third part of the rents and profits of the estate as her legal dower, was not entitled to relief, except upon some new ground of equity, as mistake or accident, and then that he should offer to do equity, as by the payment of the annuity for life, or a fair equivalent therefor, notwithstanding the subsequent marriage of the widow. The Chancellor intimated, though he did not express the opinion, that the acts of the executor as a trustee, in assigning dower, would be obligatory upon the *cestui que trust*, if there was a *cestui que trust*, and if there was none, that the estate of the trustee had terminated, and he had no equitable rights to be protected. See opinion of Chancellor, 2 Paige's Ch. R. 556 to 565. The Chancellor affirmed the decree appealed from, and the defendant McCartee sued out his appeal to this court.

The case here was argued by

*J. Duer & B. F. Butler*, for the appellant, and by

*R. Bogardus & D. B. Ogden*, for the respondents.

When in chancery, having been argued by the same counsel, and a very full and most able report of the arguments of counsel in that court having been given, and the same topics

ALBANY,
Dec. 1831.

McCartee
v.
Teller.

ALBANY,
Dec. 1831.

McCartee
v.
Teller.

having been principally insisted on here as there, the profession are referred, for the arguments of counsel, to 2 Paige's Ch. R. from page 520 to page 555.

The following opinions were delivered in this court:

By Mr. Justice NELSON. The articles of settlement in this case were made before marriage, and in addition to the household furniture, one set of plate and $1000, Jacobs settled upon his wife Elizabeth an annuity of $1200 during her widowhood; all of which were granted upon the conditions that she should remain chaste, and that she should not contract any debt above $20, without the knowledge and consent of her husband, for which he might be made accountable. Two objections have been taken to the validity of this jointure; 1. to the limitation of the annuity to the wife's *widowhood*, and 2. to the condition upon which the settlement is made, restraining her from contracting any debt over $20. I lay out of the case the question whether an infant is bound by an ante-nuptial contract, within the act concerning jointures, because the opinion of the chancellor on this point was not seriously disputed by the counsel for the respondents on the argument. I need only say, that the argument of the chancellor, and the authorities there relied on, seem to be entirely conclusive, that equally with adults, they are bound within the statute. This leaves, therefore, the questions as to the marriage articles to the objections above stated, except as to the fraud or imposition alleged, which will be briefly noticed hereafter.

It is admitted by the chancellor, in his opinion, and was conceded by the counsel for the respondents upon the argument, that an estate during widowhood, settled *after marriage*, if accepted by the wife after the death of the husband, is a good jointure, within the act. Such is the case in Moor, 31, page 103, and Vernon's Case, pl. 4 Rep. 1, the one at law, and the other in equity. But it is contended that if such a settlement was made before marriage, unlike every other case, it would still not bind the wife, unless accepted after the death of her husband. My examinations have led me to dissent

from this latter position, the reasons and authorities for which I will proceed to state.

Before the statute 27 Hen. 8, ch. 10, of which the 8th and 9th sections of our act concerning dower are copies, 1 R. L. 58, 9, no estate settled upon the wife, either before or after marriage, would bar her right to dower. By that statute a settlement, according to its provisions before marriage, was a bar, and if made after marriage, was also a bar, provided she assented to it after her husband's death. If the settlement either before or after marriage did not come within the requirements of the act, then the widow took both the estate settled, and her dower in the residue of her husband's lands. This result necessarily followed, from the law as it stood before the statute, which gave her both jointure and dower. If the statute did not apply, the common law controlled. Again; if the widow, after the death of her husband, accepted the jointure, and took the rents and profits of the same, yet, if such jointure did not come within the terms of the act, she was not barred, but was entitled to both jointure and dower. This result followed, from the position, that if the estate settled did not come within the act, the wife took both; for if entitled to both, the acceptance of one would not bar the other. Assent, therefore, by the wife, will not make a jointure a bar of dower, unless within the act, whether such jointure is made *before* or *after* marriage; and as it appears above, if within the act, and before marriage, then it is a bar without any assent.

It is supposed by the chancellor, in his opinion in this case, that the requirements of the statute, as to a settlement before marriage, are different from those after; and he came to the conclusion that an inferior estate, not within the enacting clause, settled after marriage, if accepted, would bar dower. The terms of the proviso, or 8th section of our act, are referred to as authorizing this distinction. The position, I think, cannot be sustained. The enacting clause of the statute requires that the estate in lands settled upon the wife, to bar dower, shall be for *her life*, setting out five different forms of conveyance to her. Then follows the proviso, that if any lands are conveyed to her after marriage for term of life, *or otherwise,* in jointure she may, after the death of her husband, refuse to

accept them, and claim dower. It is supposed the term *otherwise*, in the proviso, relaxes the rule in the enacting clause, and that a less estate, if accepted, is sufficient, in a settlement after marriage, within that term. The term *otherwise*, came expressly under the consideration of the court in the fifth resolution in *Vernon's* case, in which the above distinction is not recognized. The court there determine, and such has been the law as since understood, that the term *otherwise* intended to embrace any other estate conveyed to the wife, not before mentioned in the act, which was as much, or more beneficial to her, than either of the five enumerated estates for life contained in the enacting clause; that it included any estate *greater*, than for life, but none *less*, and on this ground they decide that an estate in fee comes within the words and intent of the enacting clause, and is sufficient to bar dower, though not one of the enumerated instances given therein. If this construction is correct, then it follows that the act requires the same estate to be settled upon the wife *after*, as *before* marriage, to bar her dower; and that the only difference between the two cases is her power, to refuse the former after the death of her husband. This is the opinion of Chief Justice *Wilmot*, as I understand him in *Drury* v. *Drury*, Wilmot's Opinions, 189. He says, " When the legislature determined that widows should not have both jointure and dower, it became necessary to determine which they should have. They resolved that a jointure should bar dower, but ˈqualified and relaxed the rule by giving a choice where the jointure had been made after marriage." Again, page 197, he says : " Even in respect to jointures after marriage, *femes covert* are still within the general words of the act to every purpose whatever, but the special purpose of making an election whether they will take their jointure or dower ;" and he adds : " Suppose a jointure is made after marriage, and a woman accepts it, and then brings her writ of dower ; if she is not within the general words of the enacting clause, she must have both." The same doctrine will be found in the second resolution of *Vernon's* case, and Coke Lit. 36, b. It is there held, that if the settlement is made after marriage, and accepted by the wife after the death of the husband, yet, if it was not within the enacting clause

of the statute, she was not only not barred, but was entitled to both jointure and dower. The bar then not only depends upon the acceptance of the settlement by the widow when made after marriage, but also upon the fact of its being within the enacting clause of the statute. For these reasons I am satisfied the distinction taken between the enacting clause and proviso is untenable.

It is laid down by Mr. *Clancy*, and is fully sustained by Vernon's case, and Coke Lit. that when the settlement is made upon the wife before marriage, the question as to the right of election between the jointure and dower never can arise, for if the jointure is within the statute the widow is barred by it, she can only have the jointure, and has no choice; and if the jointure is not within the act, then as before stated, she takes both, and cannot be driven to a choice. The same principle is found in Wilmot's opinion, page 215. Where the jointure is made after marriage, he says, and is pleaded in bar of dower, there is an averment that she accepted it; but when the jointure is made before marriage, acceptance is not pleaded at all. Further on, at page 216, he says, " The entry and agreement after the death of the husband can relate only to the estate made after marriage;" and the reason he gives is, that where the estate is settled before marriage, acceptance is not necessary. Again; Mr. *Clancy* says, " If the settlement is made after marriage, and during coverture, even if it is within the terms of the act, the widow is not bound by it, unless she accepts the jointure, and this by the proviso. In such a case the widow, after the death of the husband, must elect between her jointure and dower; she cannot have both, according to the terms of the proviso. And, as already has appeared, if the settlement upon the wife after marriage, and during coverture, was such as not to come within the act, then after the death of the husband she would be entitled to both jointure and dower, and could not be driven to her election. The only instance, therefore, where the widow can be put to her election between the settlement and dower, and of course where her election can at all affect her, is where the settlement is after marriage, and where such settlement is within the terms and intent of the act. And upon this view the acceptance of

the widow is wholly unimportant and inoperative, unless the settlement is made after marriage, and within the enacting clause of the statute.

From the foregoing examination, these propositions may be assumed, I think, as incontrovertible : 1. That the settlement of an estate upon a wife before marriage, and which comes within the provisions and requirements of the statute, is a bar of her claim for dower without her assent ; and 2. That the settlement after marriage, and during coverture, to bar her dower, though assented to after the death of her husband, must come within the provisions and requirements of the act ; and as a necessary deduction from both, a settlement after marriage, which if assented to would bar dower if made before marriage, would bar it without assent. This follows from the fact, that in both cases the settlement must come within all the requisites of the statute. If these positions are correct, then the cases in Moor and Coke, (Vernon's case,) are in point to shew that an estate *during widowhood*, or upon condition, if settled before marriage upon the wife, comes within the terms of the statute, and of course bars dower. Those were cases of settlement after marriage ; the one an estate during widowhood, and the other on condition to perform her husband's will, which were accepted after their husband's deaths, and the former was held to be a good legal jointure within the act, and the latter a good equitable jointure. Now it is clear, if these estates had not come within the requisites of the statute, in each case the widows would have been entitled to both jointure and dower, and their acceptance would not have barred them ; and inasmuch as the court determine they came within the act, if they had been settled before marriage, the one would have been a legal, and the other an equitable bar, without an exceptance. All the books which I have seen, recognizing the position of the chancellor, refer to Vernon's case. Roper refers to the same case as an authority for the doctrine for which I am contending, and upon a critical examination of the case, I am satisfied he has given to it the true reading. This case was a settlement made after marriage, and therefore under no circumstances could it bar dow-

er, unless assented to by the wife, and this fact alone is a sufficient reason for the court adding, after they say it was a good bar, " if accepted by the wife after the death of her husband," and accounts for the use of that expression. But many of the compilers of the law on the subject of jointures, and some of the elementary writers, have inferred from this case that because a conditional estate, settled after marriage upon the wife, would not bar dower unless accepted in every case, even if made before marriage, the settlement would not bar it without an acceptance. The language of the reporter will shew that this inference is not warranted. In the third resolution he says it was resolved, (referring to the case then under consideration) that although the estate limited to the wife was upon condition, and although dower (in lieu of which jointure comes) was an absolute estate for life, yet for as much as an estate for life upon condition is an estate for life, it was within the words and the intent of the act, if the wife, after the death of her husband, accepts it ; for he says it was agreed that a jointure is a competent livelihood of freehold for the wife, to take effect immediately after the death of the husband, for the life of the wife, if she herself is not the cause of the determination of it. Why was this conditional estate a bar of dower ? Not because it was accepted by the widow—that was only essential because it was a settlement after marriage—in such cases she must elect—but because, in the language of the court, an estate for life upon condition is an estate for life, and therefore was within the words and intent of the act. Again ; the definition given by the court of a good jointure within the act, and within which definition they decided this conditional estate came, did not put it upon the ground of the acceptance by the wife, but because a freehold for the life of the wife, if she is not the cause of the determination of it, is a good estate within the statute. I need not say that such is the case of an estate during widowhood. Further on, an illustration of the principle is given: If a man makes a feofment in fee to the use of himself for life, and after, to the use of his wife, *durante viduitate sua,* for her jointure, that is an estate for her life, and it cannot determine without her own act, and therefore it is a jointure within the act. This view reconciles the doc-

trine contained in the third resolution, with every other princi-
ple embraced in the fifth resolution in that case, and which
comprehend almost the whole of the law on the subject of
jointures.

One word as to the principle of the doctrine against
which we are contending. It will be borne in mind, the posi-
tion is that the settlement of an estate for life, upon condi-
tion, upon a wife before marriage, will not bar her right to
dower unless accepted after the death of the husband. Now,
why should greater efficacy be given to the assent of the wife,
after the death of her husband, than before marriage? Is
she not as competent to act in this respect, and as free from
restraint before entering into the marriage contract as she is
after its dissolution? If the validity of the jointure of this
kind was made to depend, as contended for by the respond-
ents, upon the assent of the wife, I apprehend it would be ve-
ry difficult to make any substantial distinction between the
assent before the marriage and after the death of the hus-
band. It was to make their situations alike that the statute
gave the right of election, after the death of the husband, be-
tween dower and jointure created by a settlement during cov-
erture.

My conclusion upon this part of the case, both on authori-
ty and principle is, that there is no difference in the estate to
be settled, or in any other requisite between the enacting
clause and the proviso of the statute; that neither a settle-
ment before or after marriage bars dower, unless within all
the requisites of the statute; that the assent of the wife is
only applicable to a settlement made after marriage, and is
not binding upon the widow then, unless the provision comes
within the act; that if the provision is not within the act,
whether made before or after marriage, the widow takes both
jointure and dower; and that inasmuch as it has been de-
cided in *Moor* and *Vernon's case*, that an estate during wid-
owhood comes within the act, and binds the widow in a set-
tlement made after marriage, when assented to, if made be-
fore marriage would bind her without assent, because the on-
ly requisite in such a case is that it should come within the
act.

At law the jointure in this case would not bar the widow's dower, because it is not an estate in lands, but though it may be wanting in some of the requisites of the act, it may still secure as compentent a provision for the wife, and would therefore be unjust to permit her to take both the settlement and dower, as she would at law ; and for this reason, equity following in analogy to the statute, will consider such a provision an equitable bar, and restrain her from suing at law for her dower. If, then, an estate during widowhood, settled upon the wife before marriage, would be a legal bar of her dower the court of chancery, in analogy to the statute according to the above rule, are bound to consider the annuity in this case during widowhood, an equitable bar. I admit the distinction taken in equity, that in the case of an infant the provision must be adequate, and not precarious ; that it must be as beneficial and as certain as that required in a legal jointure, to constitute it an equitable bar, though in the case of an adult these requisites are not essential. The widow in this case brought no marriage portion to her husband, and I cannot doubt but that the provision of all the household furniture, one set of plate, and $1000 besides the annuity of $1200, was an adequate and beneficial provision within the meaning of that rule, and such is the opinion of the chancellor, provided the *limitation* was unobjectionable; and that it was as certain a provision as is required in a legal jointure, necessarily follows from the fact, that an estate upon the condition of this annuity, would have been binding as a legal jointure. I will merely add on this part of the case, that as I consider the provision an adequate one, it will not be necessary to examine the allegation of fraud in the marriage settlement, especially upon circumstances so slight as those which are relied on.

Next, as to the limitation to contract debts over $20. A *feme covert*, while living with her husband, can make no contract binding upon him in her capacity of wife, except for reasonable necessaries, having due regard to her condition and quality in life, and the ability of her husband to pay ; nor can she bind him even to this extent, provided he furnishes these

necessaries himself for her and the family. If he refuses or neglects to do so, then she may obtain them upon his credit. They are not to starve. Reeve's Dom. Rel. 81. 5 Bos. & Pul. 152, 7. 8 Johns. R. 72. 11 id. 281. A wife may bind her husband to any extent by her contract; her authority to do so, may be made out in the same way that the power of any other agent is established by circumstances or otherwise. Indeed, the intimate relation existing between the parties of itself often goes a great way towards establishing this power, and our reports shew that this relation sometimes is abused by the trader and the wife. Now if the limitation was intended to include necessaries, it should undoubtedly be deemed unreasonable and void: but if construed to apply only to debts beyond them, then I can perceive no objection to it, either in law or reason. The language used in the marriage articles is general, and may include necessaries; but I am inclined to the opinion it was not so intended, and need not be so construed. What benefit could such a limitation be to Jacobs? With or without it, he was bound at law to provide them for his family, and he could prevent his wife from obtaining them upon his credit by furnishing them himself, or perhaps furnishing her with the money to supply them. So far as necessaries are concerned, Jacobs could gain or lose nothing by such a condition, unless indeed we adopt the idea of one of the counsel for the respondents, that it was intended for the purpose of defeating the settlement by withholding necessaries, and compelling the wife to a violation of the condition. As a more honest and more rational construction may be given to it, I think we are bound to adopt it. If not so, sure I am that a condition for the purpose supposed would be judged inoperative, both at law and in equity. If, by withholding necessaries, the wife was compelled to contract, in law and conscience, the responsibility would fall on the husband; it would be deemed his act and not hers. It seems to me, therefore, the fair intent of the parties was not to prohibit her from contracting debts for necessaries, but was designed as a protection against responsibilities beyond them. My conclusion upon the whole

is, that the marriage articles were binding upon the widow, and were sufficient to bar her right of dower.

But it is contended that admitting the settlement barred the widow's dower originally, the appellant by his acts and admissions has precluded himself from setting up the marriage articles. It appears from the pleadings and proofs that he is the only acting executor under the will of Jacobs ; that when he took possession of the estate, he was advised by a co-executor, who was a counsellor at law, and which he believed to be correct, that the widow was entitled to dower notwithstanding the articles, and so advised the widow and her attorney ; and that in pursuance of such belief, he paid from the time of Jacob's death till November, 1821, *one third* of the rents and profits of the real estate ; that on further advice, he was informed the articles barred her title to dower, and that he then withheld any further payment. It further appeared, that during this period both parties united in general applications to the chancellor for the relief of the widow, upon the basis that she was entitled to her dower, and expressly recognizing therein her right. The first observation I have to make upon this part of the case is, that unless the respondents can shew by these acts and admissions of the executor that dower has been legally assigned to the widow, and that she and her husband have thereby a vested right to the same, the whole of the argument, giving to it all the weight the facts will warrant, can extend no father than to secure the widow the funds she has already received under the mutual misapprehension of her rights. The mere facts of admitting the right to dower, and paying one third of the income of the estate through mistake and against law, afford of themselves but slender reasons for continuing such payment. If no right has vested against the estate, the executor had not only the right, but was bound in duty, so far at least to correct his error when discovered as to prevent its continuance. There is no court but would approve of his acts so far. If the executor was attempting in the court below to reclaim the money paid through this mutual mistake of the law in relation to the marriage articles, or if he was endeavoring to

deprive her of dower which had been legally assigned under this misapprehension, then I admit the maxim, " *ignorantia juris non excusat*," might with plausibility, if not legal strictness, be applied, and the only remedy, if any, would lie, not with the *trustee*, but the *cestui que trust*, whoever he might be. Whether the latter would have a remedy or not, it is not now important to examine.

The widow has no estate in land until an assignment of it be made, for the law casts the freehold on the heir, upon the death of the ancestor. Was there then, in this case, a legal assignment of dower? Lord *Coke* says eight things are to be observed in a perfect assignment ; the second is, it must be either of some part of the land whereof the widow is dowable, or a rent, or some profit issuing out of the same, and which rent may be assigned by parol. When the property assigned is capable of being severed, it must be by metes and bounds if required by the widow. She may waive such an assignment, and then she holds in common with the heir or tenant of the freehold. Rent may be assigned separately or in common, the same as land. The certainty however in the assignment, in judgment of law, is the same, whether the land or rent is separate or in common. If in common, the estate vests by assignment ; she holds like any other tenant in common, and her rights are regulated by the law applicable to that estate. An actual assignment is so essential, that where the widow brought dower out of £6 rent charge and had judgment, though it was certain she would have 40 shillings, she could not distrain before the sheriff delivered the same. The widow of a tenant in common cannot have her dower separate, but she must hold like her husband ; and yet, after judgment by her against the co-tenant, she cannot enter for her thirds till delivery be made by the sheriff, though the delivery reduced it to no more certainty than before. The case of *Turner* v. *Sturgess*, Dyer, 91, a., shews what is meant by an assignment of dower in rent. It must be rent issuing out of land of which the widow is dowable, for which she may distrain of common right, and if so, the title to the rent must vest in her. But I apprehend rent thus assigned as dower must

be a freehold rent charge, otherwise it is a misnomer to call it dower, because that is an estate for life ; it cannot be that an assignment of one third of a term for years would be deemed sufficient. The case of *Beamond* v. *Deane*, Dyer, 361, illustrates this position ; there the tenant to a writ of dower plead in bar an assignment of a rent to the demandant, made by himself for the term of her life, by virtue of which she was seised, &c. without alleging he was seised of a freehold, and therefore had power to assign. The plea held was bad for that reason. The case is more fully reported in 5 Viner, 264, tit. Dower' and it shews that the assignment of rent must not only be for life, but that the tenant must shew a power to make such assignment. The reason why the assignment of rent must be out of the same lands of which the widow is dowable is, because a right or title of a freehold estate cannot be barred by a collateral security, which clearly shews that the rent must be a freehold rent, else the reason would have no application. No doubt an assignment by parol of a freehold rent for dower would vest the estate in the widow, because an assignment in land never required livery of seisin or writing to perfect the title in her. If the above principles are correct, ·of which I have no doubt, then it is clear that no assignment of dower has been made by the appellant, either in fact or law. It was not, nor could it be pretended the respondents ever had the right to distrain for one third of the rents and profits of the real estate of Jacobs. If they had, this suit was unnecessary ; for on the refusal of the executor to pay the rents, they could have compelled the tenants to pay, or collected by distress their thirds. Much less can it be pretended that there was an assignment of a freehold rent, for none such existed. The contrary appears from the proofs in the case.

It was said upon the argument that the appellant, by his advice, had induced the widow to cancel the marriage articles, and take her dower, and that therefore he ought to be compelled to assign it, or estopped from denying her right. If this advice was given under an honest mistake as to the rights of

the widow, a court of equity could not sanction such a conclusion; as the cancellation, under such circumstances, would not impair their validity. But I am satisfied that the election of the widow to give up the articles and take dower, upon the facts in the case, was not the result of the opinion of the executor. The question was purely one of law. He was not a professional man. The friend and former guardian of the widow, and who was her legal adviser on this occasion, was a gentleman of reputation and experience in the profession, and we have his own testimony, that after taking the opinion of Mr. Anthon, and examining the will, he advised her to take the dower. Under these circumstances, on whose opinion did the widow rely in making her election? The conclusion seems to me too plain for argument. It would be a most extraordinary depreciation of the legal opinions of the counsel, if the case turned upon this point, to put her election upon the ground that the widow was influenced by the opinions and advice of the executor, on a pure question of law, rather than that of her legal adviser. This is the answer which I also give to the argument: that the widow has lost her annuity by her second marriage under a mistake of her rights. Who led her into this error? She had every means of taking care of her rights that the executor had, and no bad faith is pretended. Both were erroneously advised, and acted under its influence till the error was discovered. The fault was as much the widow's as the executor's, if she is to be responsible for her counsel. So in relation to the charge of fraud committed upon the second husband; his disappointment is to be referred to the misapprehension of the widow of her rights, for which I cannot hold the executor accountable. It is rather the misfortune of the husband than the fault of any one.

Upon the whole, without pursuing the subject further, my conclusion is, that an estate settled upon the wife before marriage, *during widowhood*, comes within the statute concerning jointures, and is a legal bar of the right of dower; and that equity following the law in this respect, is obliged to pronounce the annuity for the same period in this case an equitable bar ; that the marriage articles, in all other respects, are such as

are binding upon the widow; that there is nothing in the will of the testator evincing an intention to waive them, for the reasons given by the chancellor; that no assignment of dower has been made by the appellant, by virtue of which the widow and her husband had a vested right in the same, notwithstanding the marriage articles; that the acts and admissions of the appellant since he came into possession of the estate are satisfactorily explained, from the misapprehension of the widow's rights, under which both parties acted; and that therefore these acts and admissions, under the circumstances, ought not to subject the estate of the testator without right, and against law, to the widow's dower; that the error under which each party acted arose out of a mutual mistake, which it is the peculiar province of the court of chancery to relieve against; but that the exercise of that power of the court is not called for in this case, as all the appellant claims here is not that his errors, or those of the respondents, may be corrected by restoring to the estate monies which he has advanced by means of them, but simply to be protected from continuing further advances, after the error has been detected. It is therefore my opinion that the decree of the chancellor ought to be reversed.

By Mr. Senator ALLEN. The appellant in this cause contends, that the marriage articles were binding on the wife of Jacobs, notwithstanding her infancy, or the conditions imposed by the articles; and that the provision made in the articles is an equitable bar to her dower; and that the payment of one third of the rents and profits on account of her supposed right of dower, and the other acts acknowledging such right, are not binding on him, both parties acting under an erroneous impression and mistake.

Previous to the decision by the English house of lords, in the case of *Drury* v. *Drury*, it appears that no rule was more thoroughly understood than that an *infant* was unable, by contract or consent, to part with her real estate, or any beneficial interest in it. No woman under age could absolutely bind herself to part with her freehold, or interest in another's freehold property; and title to dower being an interest of the lat-

ter kind, falls within the above rule. But in the case of *Drury
& Drury*, it was decided by the house of lords that women
marrying under age may be barred of dower, by jointure made
previous to marriage, by their intended husbands; and that
such provision comes within the operation of the statute of
Henry the Eighth.

The marked difference between the institutions, habits
and opinions of the two countries ought, in my opinion, to
have some consideration in the decision of questions, even
where they are similar in principle and correspond in facts.
But it will be found, on comparison of the two cases, that
there is a material difference between the case of *Drury &
Drury* and the one before this court. In the former the in-
fant was possessed of both personal and real estate in her own
right, and the agreement was, that she should assign her per-
sonal estate to her intended husband, and receive in lieu of
such estate, and of her dower, six hundred pounds per annum,
during her life, to be paid her half yearly by the heirs of her
husband. This was to be in full satisfaction of her dower,
and also of her share of the personal estate, under the English
statute of distributions. To this deed the wife was a party,
and she executed it in the presence, and with the consent of
her guardian, and with whose consent the marriage was sol-
emnized. After the death of her husband, she administered
on the estate, and not only claimed her dower, but also her
part of the personal estate under the statute of distributions. In
the case before this court the infant was not possessed of any
estate, either real or personal, for aught which appears in the
case. In the former case there were no conditions insisted on
by which a forfeiture of the jointure might be incurred; while
in the latter the woman is prohibited from re-marrying, and
from contracting any debt, even for necessaries, over and above
the sum of twenty dollars, without the consent of her hus-
band, on the peril of a forfeiture of her jointure.

In England, society is so differently constituted from what it
is here, and the customs and laws, and particularly the law of
primogeniture, is so differently framed from what they are in
this country, that a construction of the common law which
may be deemed necessary there, is by no means applicable

h ere.   There the custom of marriage settlement by jointure is common, in order to keep up the titles and the dignity of families in the male line; while here the practice is of rare and uncommon occurrence; a law, therefore, which may be proper and necessary there, would, in many cases, operate with much inconvenience here.   There is also an inconsistency in the decision of *Drury & Drury*, which would not be tolerated under any other circumstances.   Neither the laws of this country or England authorize or sanction the absolute conveyance of a freehold by a minor, while in the case alluded to, the woman, though an *infant*, is permitted to part with her right of freehold in her husband's estate.   If, however, we are compelled to admit, by the decision of *Drury* v. *Drury*, that an infant may be barred of her dower by an ante-nuptial agree ment, in all matters fair and reasonable, it does not follow that an agreement entered into under circumstances such as those before this court, and containing conditions so repugnant to natural rights, must, of necessity, be binding.

It appears by the testimony, that the woman was altogether passive in the matter, for when she was asked whether she consented to the articles, her reply was, "just as Mr. Jacobs pleased to have them;" from which I infer, that there had been no previous agreement between her and her intended husband, and that the idea of marriage articles originated with Jacobs, he being a foreigner by birth and education, and not with the woman, or her friends and advisers, if she had any. The contract, therefore, was dictated by the intended husband; and the woman being an orphan, and perhaps friendless, except so far as her guardian acted as her friend, and he stated that the part he took was to accommodate Jacobs, with whom he had been long acquainted, while he knew nothing of the woman until after the request of Jacobs that he would become her guardian.   The circumstances under which this female was placed, it appears to me, give her a strong claim to relief in a court of equity.   That the woman executed the articles in ignorance of her rights, is every way probable; and it is clearly settled, that where an instrument has been executed in ignorance of the law, a court of equity will relieve;

ALBANY,
Dec. 1831.

McCartee
v.
Teller.

and in a case before Lord Talbot, he set aside a release executed by an orphan, ignorant of the full extent of her rights. Eden on Injunctions, 7. The conditions imposed by this ante-nuptial article are such as ought to avoid it, if no other considerations would do it. By this article the woman is bound to contract no debt over and above the sum of twenty dollars, without the knowledge and consent of her husband, and for which he may be made accountable, on pain of forfeiting, not only the designated amount in lieu of dower, but her dower also. This condition, however, is clearly illegal, as the law permits the wife, at all times, to contract debts for necessaries, while in the article she is bound not even to contract a necessary debt, amounting to more than twenty dollars, without breaking the contract.

The condition that the woman shall remain the widow of Jacobs, or forfeit the annual allowance, ought to find no countenance here. Any condition which imposes restrictions upon marriage is against the policy of the law, as the law encourages marriages. 4 Burrows 252. It is a general rule, that a condition annexed to a devise, or bequest for life, whereby it is to be divested by the marriage of the devisee or legatee, is to be considered as intended merely *in terrorem*, and is therefore void; because limitations in restraint of marriage are not to be favored. *Parsons v. Winslow*, 6 Mass. R. 169. *Kelly v. Monk*, 3 Ridgeway's Parliamentary Cases, 261, was a case where a legacy was left to a daughter by her father, upon the following conditions: 1. That she should not marry without the consent of her mother and uncle; and 2. Nor with such consent, unless the man she should marry had a freehold estate of five hundred pounds per annum. On the hearing of the cause, the Lord Chancellor observed, "that conditions prohibiting marriage, or leading to a probable prohibition of marriage, are condemned upon principles of sound and general policy, and are void. Conditions in restraint of marriage are odious, and therefore are held to the utmost rigor of strictness." In principle, the condition imposed by Jacobs on this young woman was the same in effect as that in the above case, and it ought, therefore to avoid the marriage articles, and leave her to her legal rights of dower.

It was contended that the provisions made by the articles were ample, and therefore an *equitable bar* to her dower. The real estate of which Jacobs died seised, was worth at least one hundred thousand dollars, and the annual stipend, therefore, was not equal to her dower, even if the objectionable provisions had been omitted. An equitable jointure ought to be as certain as the dower; it ought to be certain in amount, and certain as to continuance, during the life of the widow. Now, can a provision, with the uncertainty depending on her marriage, and the contracting even necessary debts of more than twenty dollars, be as certain as her dower? Had there been no articles insisted on by Jacobs previous to his marriage, his widow would have taken her dower without the interference of any one; she would have been free to re-marry or not, as her interest or inclination might lead her, and during the life of her husband she would not have been restrained as to the amount of debts she might contract, except so far as her prudence should dictate. In *Caruthers* v. *Caruthers*, 4 Bro. Ch. 513, the master of the rolls observed, that he thought the case of *Drury* v. *Drury*, did not mean to decide that a guardian had a right to bind an infant, if the provision was not certain, or if she was to take only on a contingency. Lord Coke defines a jointure to be a competent livelihood of freehold for the wife, to take effect immediately after the death of the husband, and to continue for the life of the wife. In *Drury* v. *Drury*, the wife has as certain a provision as her dower; therefore, that case only decides that where the provision is equally certain with the dower, it is good. In another case, 1 Bro. Ch. 154, the chancellor held, that to bind an infant, the settlement must be fair and reasonable. Taking into view, therefore, the circumstances of Jacobs at his death, the disparity in the ages of the parties, and other matters arising out of the connection, I am of opinion that the settlement on the widow by the marriage articles was not fair and reasonable, and that she was accordingly entitled to her dower.

But when we advert to the acts of the executors, after the decease of the husband, in advising the widow to except her dower, and in actually paying her the one third of the nett proceeds of the estate for several years in succession, there

.can hardly be substantial reason urged why she should now be deprived of it.   Jacobs died in October, 1818, and it appears by the testimony of Mr. Bogardus, that a few days after his death, his widow consulted him on the subject of taking her dower in lieu of the marriage settlement; she said the executor had called on her and told her she had a right to take the dower, or to take under the marriage articles ; that Mr. Bogardus called on the executor, and inquired whether the widow had this right, to which he replied that she had, and that he had advised her to take the dower, and that she was a great fool if she did not.   This was within ten days after the death of Jacobs.   The other executor gave the same advice, and Bogardus finally informed the widow that he had seen the executors and had read the will, and advised her to elect to take her dower ; she did elect to take it, and requested him to notify the executors accordingly, which he did.   His opinion was, that the widow ought to execute some writing to cancel the marriage articles but the executor thought it unnecessary, for that the articles either were destroyed or that he would destroy them, and that Bogardus or the widow might destroy the counter part ; upon which Bogardus delivered the widow the counter part, which she destroyed in his presence.   In an application to the chancellor, in March, 1819, the widow stated her right of dower, and two of the executors, by a certificate attached to the application, admitted her to be entitled to dower.   The chancellor, in two orders made by him, recognized and took it for granted that the widow was entitled to dower, particularly in the order of the 17th June, 1820, wherein he directs that the widow be paid the interest of one third part of the money received for the premises in Fayette street, in lieu of her right of dower in the two houses and lots taken to improve Oliver street, and that the same be paid her during her natural life, or until she and the executors shall have agreed upon a gross sum to be paid her from the said principal sum ; that she is justly charged with a part of the insurance, &c. so long as she chooses to receive her proportion of the rents from the executors instead of having her dower regularly assigned and set off to her.   To all this there was no objection interposed by the executors, and her right of dower, therefore, was not only recognized, but

also her right to have it regularly assigned and set off to her, whenever she should deem it her interest so to direct. It was afterwards arranged between the widow and the executors that she should receive a gross sum of the money awarded for the property in Fayette street, in lieu of her right of dower in said property, and application was made to the chancellor for an order to that effect. In a certificate signed by two of the executors, they admit the receipt of the money for the two houses and lots, " part of the real estate of which the said Jacobs died seised, *and in which Elizabeth Jacobs, his widow, was entitled to dower.*" In August, 1821, they paid the said Elizabeth $1484,50, as a full compensation for her claim of dower in the said premises, and received from her and her then husband, Teller, a full discharge as for the dower of the said Elizabeth in the aforesaid property.

ALBANY,
Dec. 1831.

McCartee
v.
Teller.

In the answer of the executor to the bill of complaint, he admits that he did pay and account to the widow for one third of the rents and profits of the real estate in the city of New-York, as and for her dower therein, from the death of her husband in 1818 to 1821. In February, 1821, the widow was married to Pierre Teller, about two years and four months after the executors had advised her to take her dower, and during which they had regularly paid her the one third of the income of the estate. After his marriage, Teller was consulted by the acting executor whenever any repairs or expense was to be incurred on the real estate, and in February, 1822, the executor informs him by letter what were the offers for renting a part of the property, and requests his opinion on such offers. On the 6th of August, 1822, he requests Teller to call and receive the balance of the last year's rent. In his account rendered for the rents received from May, 1821, to May, 1822, an item of $166,48 is charged as commissions for collecting rents, &c. It appears, therefore, from the fact of the executor deeming it his duty to consult Teller and his wife on the subject of renting the property, and whenever repairs were necessary, and also from the fact of charging commission for attending to the business of collecting, &c. that he was clearly acting as the agent of Teller and his wife, and that he considered himself as their agent, at least, *so far*

as they were interested in the estate. The question then is, shall the executor, after such unequivocal acts of agency, now plead that he did not act for Teller and his wife, but for others? In *Dixon* v. *Hammond*, 2 Barn. & Ald. 313, it was held that the settled rule of law is, that an agent shall not be allowed to dispute the title of his principal, and that he shall not, after accounting with his principal, and receiving money in the capacity of agent, afterward say that he did not receive it, or that he did not receive it for the benefit of his principal, but for that of some other person. If the executor was the agent of Teller and his wife, and it appears to me it can hardly be questioned, then he has no right to dispute their title to the one third of the income and profits of the estate, and after accounting with them for years now say that he no longer receives for them, but for others.

The executor states, in his answer to the bill of complaint, that he was advised by John Anthon, Esq. counsellor at law, and who was one of the executors named in the will of Jacobs, that the marriage articles were invalid by reason that the said Elizabeth was an *infant*, and therefore that she had a right of dower in the real estate of her late husband; but that in 1823 he obtained the advice of other counsel on the marriage articles, and that it was their opinion that the articles were valid and binding on the said Elizabeth, and that she had no right of dower in the real estate of her late husband; and that he has since that period refused to pay or account to her or her husband, for any portion of the rents or profits of the said real estate. The opinion of counsel is not, however, set out in the case, nor is there any proof adduced that such was the opinion given, except the averment of the executor himself. Whatever may have been the opinion of counsel, the facts are, that the executor admitted the widow's right of dower on the death of her husband; he paid it to her quarterly for more than three years; he directed the marriage contract to be destroyed as of no validity; he joined in the statement made to the chancellor by the widow, admitted her right of dower, and that she had elected to take it; he complied with the decree of the chancellor, by paying the widow the one third of the money received for the property in Fay-

ette street, and received from her and her husband a release as for her dower in that property ; he consulted Teller and his wife as to the renting of the property, as late as February, 1822, and actually paid them their portion of the rents in August of the same year; and after all this, shall he now be permitted to say that all was done through mistake and inadvertence, and for the want of knowledge of the law? The case of *Storrs* v. *Barker*, 6 Johns. Ch. R. 166, may be referred to as establishing a principle that ought to govern in the case before this court. The property in question in that case was devised by the daughter of Barker to her husband, who, on the advice of Barker, sold it to Storrs. Barker, however, at the time of giving the advice and urging the sale to Storrs, was ignorant of his own title to the property, as the legal heir of his daughter; and on ascertaining this fact, he brought an action of ejectment against Storrs for the recovery of the land. The bill prayed for an injunction to stay the action. The chancellor held, that where one having title acquiesces knowingly and freely in the disposition of his property for a valuable consideration, by a person pretending to title and having color of title, he shall be bound by such disposition of the property, and especially if he encouraged the parties to deal with each other in such sale and purchase; and it would seem to be a wise principle of policy, that ignorance of the law, with knowledge of the facts, cannot generally be set up as a defence ; and it appears to be settled by a course of equity decisions, that ignorance of one's legal right does not take the case out of the rule when the circumstances would otherwise create an equitable bar to a legal title. A perpetual injunction was decreed. And in the case of *Lyon* v. *Richmond*, 2 Johns. Ch. R. 51, it was held that the court does not undertake to relieve parties from their acts and deeds fairly done, with a full knowledge of facts, though under a mistake of the law ; for every man is charged at his peril with a knowledge of the law. Upon the same principle, when the executors in this case had all the facts before them—the will of Jacobs, the ante-nuptial contract, and a general knowledge of the circumstances under which it was executed—and with all these facts before them, unanimously advised the widow to claim her dow-

er, ought they not to be bound by such advice? And if it is a wise principle of policy, that ignorance of the law with knowledge of the facts cannot generally be set up as a defence then we have a right to say to the appellant in the present case, you acted with a knowledge of all the facts; you had the will, and as that refers to the marriage articles, you cannot plead ignorance of their contents and conditions; and if through ignorance of the law, which you were bound to know you have permitted and advised the course you now repudiate, you must abide the consequences. Because you were ignorant, is no reason that others should suffer, especially when they acted on every occasion by your advice and counsel.

The case then stands thus: Under the advice of the executor, the woman destroyed the marriage settlement; and in consequence of this advice, as I infer, she married again. If she is not entitled to dower, therefore, because the marriage settlement is valid, she is not entitled to the provisions of the settlement because she has married and thus forfeited them. Not only the woman has been deceived by the advice of the executor, but the man who married her; for I have a right to infer from the circumstances of the case, had it not been for this advice, she would not have married, and by that means have forfeited the provisions of the marriage settlement, and that the man would not have married her, had he not been advised that the marriage articles were void, and she entitled to her dower. Although, under every view of this case, I consider the act of the executor in refusing to pay the one third part of the rents and profits of the estate, for and on account of dower, to the said Elizabeth, as illegal and unjust, I nevertheless believe, from the general character of the individual for probity and uprightness, that he acted solely from an ignorance of the law, and not from any sinister or improper motives in bringing the matter to a final issue in this court.

I am of opinion that the decree of the chancellor ought, in all things, be affirmed.

On the question being put, *Shall this decree be reversed?* the members voted as follows:

*In the affirmative*—The President of the Senate, Mr. Justice Nelson, and Senators Armstrong, Bronson, Lynde, McLean, Tallmadge, and Throop—8.

*In the negative*—Senators Allen, Conklin, Deitz, Gere, Mather, Maynard, Rexford, Sanford, Warren, and Westcott—10.

Whereupon the decree of the Chancellor was *affirmed.*

---

In the case of *Drury and Drury,* referred to in the preceding opinions, the law in *England* was settled, that an *infant* is bound by a legal jointure, and that in equity, in analogy to the statute, an infant may be barred by an *equitable jointure* settled upon her before marriage, by the consent and approbation of her parents or guardians. This decision was made under a statute of which our statute relative to *jointures,* passed in 1787, 1 R. L. 58, § 8 & 9, is substantially a transcript, and the question raised in *Drury and Drury* might, previous to the last revision of our statutes, have been agitated here, unless that decision was deemed binding upon our courts, it having been made previous to the revolution. Independent of that decision by the revised statutes, 1 R. S. 741, § 10 & 11, the law with us is no longer open to *judicial construction,* at least as to cases arising since those statutes went into operation. Notwithstanding, as a legal curiosity, the Reporter is induced to republish the report of the case of *Drury and Drury,* from Lord *Chief Justice Wilmot's* "Notes of Opinions and Judgments," as containing the *reasons* for the decision in that case, which are not to be found in any other report, and the work from which the report is taken not being very common in this country.

### * HOUSE OF LORDS.

John, Earl of Buckinghamshire, and Mary Ann, Countess of Buckinghamshire, his wife, late Mary Ann Drury, spinster, and Jocosa Catharina Drury, spinster, an infant, by her next friend, *appellants, vs.* Dame Martha Drury, widow, *respondent.*

By indenture tripartite, dated 5th October, 1737, previous to a marriage between the respondent (the mother of the ap-

* Page 177.

pellants, the Countess of Buckinghamshire, and Jocosa Catharina Drury) and Sir Thomas Drury, baronet, deceased, who was the father of the said appellants, and made between the said Sir Thomas Drury, of the first part ; the respondent, then Martha Tyrrell, spinster, one of the daughters of Sir John Tyrrell, baronet, deceased, of the second part ; and Joseph Townsend and Thomas Matthews, esquires, of the third part : After reciting the intended marriage, it was declared and agreed, that the said Sir Thomas Drury should be entitled to and receive all the personal estate and effects which the respondent was possessed of or entitled to, for his own use and benefit ; and that all the lands, tenements and hereditements, then late of the said Sir John Tyrrell, which should descend to or devolve upon the respondent during the intended coverture, should be settled and assured in manner thereinafter mentioned ; and also that the respondent, in case she should survive the said Sir Thomas Drury, should have and enjoy a clear annuity of six hundred pounds during her life for her jointure, and in full satisfaction and bar of all dower ; and also in lieu and full satisfaction of any share or distributory part of any personal estate which the said Sir Thomas Drury should be possessed of or entitled to, and which she should or might claim or demand by virtue of the statute for the distribution of intestates' estates, or otherwise howsoever. And Sir Thomas Drury, in consideration of the said intended marriage, and of the portion which the respondent was possessed of or entitled to, and which would accrue to him in case the said marriage should take effect, did, for himself, his heirs, executors and administrators, covenant with the said Joseph Townsend and Thomas Matthews, their executors and administrators, that the heirs, executors and administrators of him, Sir Thomas Drury, in case the respondent should survive him, should pay her during her life, the clear yearly sum of six hundred pounds half yearly ; and also that in case any lands of the said Sir John Tyrrell, deceased, should in any wise descend or come to the respondent during her said coverture, then Sir Thomas Drury and the respondent should and would immediately thereupon convey, settle and assure all such lands to the use of Sir Thomas Drury, during his life ; remainder to the use

of the respondent and her assigns, during her life ; and after her death, to the use of the said Sir Thomas Drury and his heirs and assigns forever.

This deed was executed by Sir Thomas Drury and the respondent, being then an infant under the age of twenty-one years, in the presence of Elizabeth Kellaway, the respondent's then guardian, who was a subscribing witness thereto. The marriage was solemnized soon after, with the privity and approbation of the said Elizabeth Kellaway; and the respondent, at such marriage, was entitled to a portion not exceeding two thousand pounds.

On the 20th January, 1759, Sir Thomas Drury died intestate, being seised in fee simple of a real estate of the yearly value of two thousand six hundred pounds ; and he was also, at his death, possessed of a personal estate to the amount of sixty thousand pounds or upwards ; and at his death left the respondent, his widow, and the appellants, the Countess of Buckinghamshire and Jocosa Catharina Drury, his only children and co-heiresses at law, being both then infants.

Soon after the death of Sir Thomas, letters of administration of his personal estate were granted to the respondent, and she possessed the same, or great part thereof; and afterwards insisted, that as she was an infant at the time of the execution of the aforesaid indenture of settlement, and at the time of the solemnization of her marriage, she was not bound to accept the provision thereby made for her, but that she was entitled to dower out of the real estate of Sir Thomas Drury, and to her distributive share of all his personal estate.

And therefore the appellants, the Countess of Buckinghamshire, (then Mary Ann Drury, spinster,) and Jocosa Catharina Drury, (both then infants,) by their next friend, in Trinity term, 1759, exhibited their bill in the court of chancery against the respondent, stating the before mentioned particulars, and praying that an account might be taken of the rents and profits of the real estate of Sir John Drury received by the respondent, and also of the personal estate and the interest and profits thereof, and of his debts and funeral expenses; and that the clear surplus of his personal estate, after payment of his debts, might be brought into court, and placed out at inter-

Drury
v.
Drury.

est for the benefit of the appellants during their minority ; that proper persons might be appointed to receive the arrears and growing rents and profits of the real estates, and also of the personal estate, during the minority of the said appellants ; and that out of the rents and profits of such real estate, and the interest and produce of such personal estate, the said annuity of six hundred pounds might be retained by or paid to the respondent for the time past and to come ; and that a suitable allowance might be made for the maintenance and education of the appellants, for the time past and to come ; and that the savings of the appellants' yearly income, after deducting what should be so paid for their maintenance and education, might be from time to time placed out at interest, and improved for their respective benefit. during their minority.

To this bill the respondent put in her answer, and thereby said, that she had possessed so much of the personal estate of Sir Thomas Drury as she was able, but that she had not received any rents or profits of his real estate ; and she insisted, that as she was an infant when she executed the said indenture of settlement, and at the time of her marriage, she could not nor ought to be barred by the said indenture, but was at liberty to make her election whether she would accept the said annuity, or waive the same, and take her dower out of the real estate of Sir Thomas Drury, and her distributive share of his personal estate under the statute ; and she submitted to account, having all just allowances. And if the court should be of opinion she was at liberty to waive the annuity of six hundred pounds, and to claim such rights as she was by law entitled to, in and to the real and personal estates of Sir Thomas Drury, then she waived the annuity, and claimed to be entitled for her life to a third part of the real estates as her dower, and also to be entitled absolutely to a third part of the clear residue of his personal estate, and of the interest and produce thereof. But if the court should be of opinion that she was bound by the said indenture, notwithstanding she was an infant at the time of executing the same, then she claimed to be entitled, by virtue of the said indenture, to a clear annuity of six hundred pounds per annum, from the time of the death of Sir Tomas Drury, payable half yearly dur-

ing her life; the first payment to be made on the 25th March, 1759; and she also claimed a suitable allowance for the maintenance of the appellants, her daughters, from the death of their father to that time, and also for such further time as she should maintain them.

This answer being replied to, depositions were taken in the cause, whereby it appeared that the respondent was born on the 23d December, 1716, and intermarried with Sir Thomas Drury on the 11th October, 1737.

The cause was heard (a) before Lord Chancellor Henley, on the 27th, 28th and 29th of February, 1760, and the 3d, 4th, 6th and 7th of February, and 1st June, 1761; on the last of which days, his lordship decreed, that it should be referred to the master to take an account of the personal estate of Sir Thomas Drury, come to the hands of the respondent, and of his debts and funeral expenses, which were to be paid out of his personal estate, in a course of administration; and his lordship declared that the respondent, being an infant at the time of her executing the indenture of the 5th of October, 1737, was not barred of her dower in the intestate's real estate, nor of her share of his personal estate, under the statute of distributions; and therefore his lordship ordered, that so much of the bill as sought to bind the respondent by the said agreement, should stand dismissed, and that the clear surplus of the said intestate's personal estate, after payment of his debts and funeral expenses, should be divided into three equal parts, whereof one third part was to be paid to or retained by the respondent as her share thereof under the said statute, and the

(a) Vide Harg. Co. Litt. 36, note 7. Where, speaking of this case of Drury v. Drury, Mr. Hardgrave says, "The points determined by Lord Northington "were, 1st. That the statute of 27 Hen. VIII, which introduced jointures, "extends to adult women only, infants not being particularly named; and "therefore, that notwithstanding a jointure on an infant, she may waive the "jointure, and elect to take dower: 2d. That a covenant by the husband, "that his heirs, executors or administrators, shall pay the wife an annuity for "her life, in full for her jointure, and in bar of dower, without expressing that "it shall be charged on any particular lands, or be secured out of lands gener- "ly, is not a good equitable jointure within the statute; 3d. That a woman "being an infant, cannot, by any contract, previous to her marriage, bar her- "self of a distributive share of her husband's personalty, in case of his dying "intestate.

other two third parts thereof were two be invested in the pur-chase of three per cent. bank annuities, in the name and with the privity of the accountant general in trust in this cause, for the benefit of the appellants, the Countess of Buckinghamshire and Jocosa Catharina Drury respectively, until they should attain their age of twenty-one years; and he was to declare the trust thereof accordingly, subject to the further order of the court; and if the said two third parts belonging to the ap-pellants respectively, or any part thereof, had been already in-vested in government securities, the same were to be transfer-red to the said accountant general, in trust in the cause, for the said appellant's benefit; and he was to declare the trusts there-of in like manner; and the appellants were to be respectively at liberty to apply to the court for further directions relating thereto, as there should be *occasion; and directions were given concerning the allowance for the maintenance and ed-ucation of the appellants; and a receiver, who had been be-fore appointed of the intestate's real estate, under an order made in the cause, was to be continued until the further order of the court, to pass his accounts before the master, and to pay one third part of the clear yearly rents of the said intestate's real estate, from time to time as the same should be received by him, to the respondent, in lieu and satisfaction of her dower, and the other two third parts of such clear yearly rents, from time to time as the same should be received, into the bank, with the privity of the said accountant general, to the account of the cause; and directions were given for placing out such two third parts of the said rents from time to time, for the ben-efit of the appellants, the Countess of Buckinghamshire and Jocosa Catharina Drury; and all parties were to be paid their costs of the suit to that time, to be taxed by the master, out of the intestate's estate; and his lordship reserved the considera-tion of subsequent costs, until after the master should have made his report.

Soon after pronouncing this decree, viz. 14th June, 1761, the appellants, the Earl and Countess of Buckinghamshire, intermarried; and the cause having been duly revived on that

.*Page 183.

occasion, the present appeal was brought to reverse the de-  <span style="float:right">Drury<br>v.<br>Drury.</span>
cree.

After hearing counsel on this appeal, the following question
was put to the judges by their lordships, viz:

" Whether a woman, married under the age of twenty-one
years, having before such marriage a jointure made to her in
bar of *dower, is thereby bound and barred of dower within
the statute of the 27th of Hen. VIII. ?"

The judges differing in opinion, they were directed to deli-
ver their opinions " seriatim," with their reasons.

Mr. Justice WILMOT. This question depends entirely up-
on the true construction of the several clauses in the 27th Hen.
VIII. ch. 10, (a) relating to jointures; and in order to get at
that construction, it will be necessary to †consider the man-
ner of making provisions for wives upon marriages, and for
the issue of those marriages; and how the law stood, both in

(a) The clauses are :—

6. " And be it further enacted by the authority aforesaid, that whereas di-
" vers persons have purchased, or have estate made and conveyed, of and in
" divers lands, tenements and hereditaments, unto them and to their wives,
" and to the heirs of the husbands, or to the husband and to the wife, and to
" the heirs of their two bodies begotten, or to the heirs of one of their bodies
" begotten, or to the husband and to the wife for the term of their lives, or for
" term of life of the said wife; or where any such estate, or purchase of any
" lands, tenements and hereditaments, hath been or shall hereafter be made
" to any husband, and to his wife, in manner and form above expressed, or
" to any other person or persons, and to their heirs and assigns, to the use
" and behoof of the said husband and wife, or to the use of the wife, as is be-
" fore rehearsed, for the jointure of the wife; that then, and in every such
" case, every woman, married, having such jointure made or hereafter to be
" made, shall not claim nor have title to have any dower of the residue of the
" lands, tenements or hereditaments, that at any time were her husband's, by
" whom she hath any such jointure, nor shall demand nor claim her dower of
" and against them that have the lands and inheritances of her said husband;
" but if she have no such jointure, then she shall be admitted and enabled to
" pursue, have, and demand her dower, by writ of dower, after the due course
" and order of the common laws of this realm; this act, or any law or pro-
" vision made to the contrary thereof notwithstanding."

7. " Provided always, that if any such woman be lawfully expulsed or
" evicted from her said jointure, or from any part thereof, without any fraud

* Page 184.        † Page 185.

Drury
v.
Drury.

respect of these provisions and of dower, before that statute was made, and what alteration it intended to make in this species of property.

Before that statute, the legal estate of the greater part of the real property in the kingdom was, for reasons unnecessary to be now mentioned, in the hands of feoffees to uses or trustees; and when persons were in possession, and received the rents and profits of those estates, married and died, women were not dowable of those estates, because the legal seisin had always remained in the feoffees, and had never been in their husbands.

The consequence arising from this separation of the legal and usufructuary interest was, that husbands provided for their wives *before or after marriage, either by feoffments made to the uses of themselves and their wives, under the statute of

" or covin, by lawful entry, action, or by discontinuance of her husband, then
" every such woman shall be endowed of as much of the residue of her hus-
" band's tenements or hereditaments, whereof she was before dowable, as
" the same lands and tenements so evicted and expulsed shall amount or ex-
" tend unto."

8. " Provided also, that this act, nor any thing herein contained or express-
" ed, extend or be in any wise hurtful or prejudicial to any woman or women
" heretofore being married, of, for, or concerning such right, title, use, interest
" or possession, as they or any of them have, claim, or pretend to have, for
" her or their jointure or dower, of, in, or to any manors, lands, tenements,
" or other hereditaments of any of their late husband's, being now dead or
" deceased; any thing contained in this act to the contrary notwithstanding."

9. " Provided also, that if any wife have, or hereafter shall have any manors,
" lands, tenements or hereditaments, unto her given and assured, after mar-
" riage, for term of her life or otherwise, in jointure, except the same assur-
" ance be to her made by act of parliament, and the said wife, after that, for-
" tune to overlive her said husband in whose time the said jointure was made
" or assured unto her, that then the same wife so overliving, shall and may, at
" her liberty, after the death of her said husband, refuse to have and take the
" lands and tenements so to her given, appointed or assured, during the cov-
" erture, for term of her life or otherwise, in jointure, except the same assur-
" ance be to her made by act of parliament as is aforesaid; and thereupon to
" have, ask, demand, and take her dower, by writ of dower or otherwise, ac-
" cording to the common law, of and in all such lands, tenements and here-
" ditaments, as her husband was and stood seised of any state of inheritance,
" at any time during the coverture; any thing contained in this act to the
" contrary thereof notwithstanding."

* Page 186.

Drury
v.
Drury.

1 Rich. III, which enabled cestui que use to convey ; or by limiting uses to them by deed ; or by taking conveyances of the legal estate from their feoffees to themselves and their wives, either for life or in tail ; and sometimes the ancestors, or collateral relations of the husband, conveyed estates to the husband and wife, for life or in tail ; and being usually made to them "jointly," this kind of provision from thence acquired the name of a " jointure."

The statute of the 11th Hen. VII. ch. 20, was made on purpose to guard these provisions, and to avoid all discontinuances, alienations, and warranties made by wives of these estates, to the prejudice of the issue or heirs of the husband. And though the word jointure is not in the 11th Hen. VII. yet it was held, 1 Leo. 261, 1 Cro. 2, that no estate limited to a wife is within the meaning of that statute, unless it appears to have been made for her jointure, where the inheritance was to go to the issue or heirs of the husband ; and these provisions went by the name of estates made " ex provisione viri." And from this statute of the 11th Hen. VII. and also from the recital in the clause relating to jointures in 27 Hen. VIII. it appears that these estates were frequently limited to the husband and wife, and the heirs of their bodies, and sometimes to the husband and wife, and to the heirs of the body of the wife ; and the strictest settlement which could be made at the time of passing this act, was to limit the estate to the heirs of the body of the wife, so as to bring it within the protection of the act of the 11th Hen. VII. The limitations to trustees, to preserve contingent remainders, was not then invented ; and therefore if the estate was limited to the husband *for life, remainder to the first and every other son of the marriage, he might bar the contingent remainders before the existence of issue ; or if the estate was limited to the husband in tail, he might bar the estate tail, and the remainders too, by a recovery. The most that could be done, was to vest the estate tail in the wife, and then it was under the protection of the 11th Hen. VII ; and it appears from the books that these kinds of limitations were very frequent, sometimes of the estate itself,

* Page 187.

Drury
v.
Drury.

but oftener of the use ; and it was more natural they should be so, because it was carrying the check upon alienations, so anxiously aimed at by every body, as far as the policy of the law would then endure.

And it was usual to make these kinds of limitations, not only upon the prospect of a marriage then under immediate contemplation, but estates were settled by ancestors, and taken upon purchases, with limitations to women whom they or their sons should afterwards marry, without a view to, or so much as the knowledge of any particular woman who was to take under it.

And I lay infinite stress upon this mode and fashion of settlements at the time of making the act, because it will open the true reason of giving them the quality of a bar of dower, and that reason will apply as strongly in the case of infants as of adults.

One great inconvenience accompanied these kinds of provisions : for whether they were made before or after marriage, if the husband had the legal seisin of any other estates, either in fee or fee tail, the wife would be entitled to dower in those estates, and keep the jointure too.

This inconvenience did not frequently happen, because the legal estate and the use were seldom in the same hand : and husbands *had it absolutely in their power to prevent it, by putting the estates which they had before their marriage, into feoffees, and by taking all subsequent conveyances to feoffees, or to themselves and others jointly, so as to prevent the right of dower from ever attaching. But when the legislature had come to a resolution to consolidate the use and the legal estate, and to unite them together to all intents and purposes, they saw very plainly that it was necessary to make several regulations, not only in respect of the immediate and instantaneous influence which this consolidation would have upon real property as between persons then married, but also as to persons who should marry after the act was made.

From the preamble of the statute, it is clear the legislature intended that one consequence arising from this union should

* Page 188.

take place in its fullest extent; and that was, in cases where no settlements had been made upon wives, "ex provisione viri."

In those cases, all wives, present and future, were to have dower of all the estates of inheritance whereof their husbands were seised during the coverture. And in this respect the act was very beneficial to wives. It was not an enabling act; for it did not give a right of dower, but the consolidation ampliated and enlarged the fund and subject matter of that right by putting all their husbands' estates within the reach of it.

It is equally clear, that where settlements had been made upon wives, "ex provisione viri," whether they were made before or after marriage, the legislature intended that they should not retain the estates given by those settlements, and be entitled to dower besides; and in this respect, the act was an abridgment of the right which the common law gave them, of retaining both. And another *thing is equally clear that the act leaves widows who were then living, exactly as it found them, entitled either to their settlement " ex provisione viri," or to dower, or to both, or to neither, in the same manner as they would have been if the act had never been made.

When the legislature had determined that widows should not have both jointure and dower, it became necessary to determine which they should have; either to make jointure bar dower, or dower bar jointure, or, to give them their choice. They resolved that a jointure should bar dower; but qualified and relaxed the rule, by giving a choice where the jointure had been made after marriage.

The substance of the clauses expressing the intention of the legislature upon the several points I have mentioned, is, that a woman who then had or thereafter should have a jointure made, should not have dower in the residue of her husband's estate; but if she was evicted of all or any part, then she was to have a compensation out of the residue of her husband's estate; or if the jointure was made after marriage, she might refuse her jointure and claim her dower, with a proviso to save the rights of widows then existing. And it is very material in this place to observe, that the act does not lay down two differ-

* Page 189.

Drury
v.
Drury.

ent rules, one for jointures which had been made before the act, and another for jointures which should be made after the act; but the rule laid down in one case, was to govern equally in the other.

It is impossible to sever the cases in point of construction, because they are connected together in the same sentence; the words are spoken in the same breath—"jointures made or hereafter to be made;" the measure of the right was to be exactly the same; and indeed the *clause is worded in such a manner as to shew they had their eye principally upon the right of persons who were then married.

And though it was also intended, "imponere normam futuris," yet the immediate object in their thoughts, was the case of women then living; and the adjustment of their rights, was to be the model by which the rights of all women who should be married after the act, were to be determined. And this case must now be considered as the case of an infant married at the time of the act, and surviving her husband; and therefore the true question in this case is really no more than this:

Whether the words in this act of parliament, "every woman married, having such jointure made," that is, having a settlement "ex provisione viri" with such limitations as are mentioned in the recital, or wh'ch fall within the equity of those limitations, did not comprise every woman then married, whether she was an infant or an adult person when she married?

If the words "being under age, or of full age," had been added to the words "every woman married," there could have been no doubt but she would have been bound by them.

I think that it appears as clearly to be the intention of the legislature to comprise infants in these general words, as if they had been expressly named.

1st. The words are general—"every woman married," without distinguishing whether they were of age or under age; and therefore, taking them in their common and ordinary signification, they comprise infants as well as adult persons.

And the exceptions and notice taken of infants in many acts of parliament, are a strong indication of the sense of the legis-

* Page 190.

Drury
v.
Drury.

lature, that *even in respect of parliamentary bars to their right, general words would include them.

The 1 Rich. III. ch. 7, directing that fines conclude as well privies as strangers, excepts infants.

. The statute 4 Hen. VII. ch. 24, excepts them particularly; and that act is worded in such a manner as to shew most manifestly the legislature thought that the words " the fine to be a final end, and conclude as well privies as strangers to the same," would have comprised infants, if they had not been excepted.

And the case of Stowell and Zouch, in Plowden's Commentaries, is a direct authority in point, that in a case which does not fall within the exceptions of that law, the general words extend to infants as well as adult persons.

A disseisor levied a fine; two years passed ; the disseisee died, leaving an infant heir at law, who insisted that he was not barred by the fine till five years after he came of age; but as the exception did not extend to that case, and the time began to run in the life of his ancestor, it was held that it should run against him, as if he had been an adult.

1 Rich. III. ch. 1, enabling cestui que use to make feoffments, proceeds upon a supposition that general words would include infants; and to guard against that consequence, adds to the general words, " any person or persons being of full age."

The 23d Hen. VIII. and 21 Jac. I. statutes of limitations, except them particularly, upon an apprehension that the general words "person or persons," would have included them.

The statute 31 Hen. VIII. c. 13, sec. 16, enacts, " that the " king shall hold and enjoy all such honors, castles, manors, " † lands, &c. as he hath obtained, and has by way of ex- " change, bargain, purchase, or other whatsoever mean or " means, according to the true intent and meaning of his high- " ness's bargain, exchange or purchase, notwithstanding any " mis-recital, mis-naming, non-recital or not naming of the " honors, castles, &c. comprised or mentioned in the writings " or bargains made between the king's highness and any other " party or parties, or of the towns or counties where they " lie, with a saving of the rights of all persons, except the

* Page 191.          † Page 192.

Drury
v.
Drury.

" persons themselves of whom the bargain, exchange or pur-
" chase, was had, their heirs and their wives."

This act took away the right of dower from the wives of
the grantors ; and the exception of wives out of the saving,
shews the sense of the legislature upon a title of dower ; that
it was " a small thing, and casual," and therefore took it
away from her, though she was not so much as party to the
grant.

The husband might then have defeated dower by felony as
well as treason ; and as he might have deprived his wife of it
by a crime, the act gave the same effect to his grant.

The exception out of the saving, evidences the intention of
the legislature to take the dower away, without any equiva-
lent at all.

So in *Needler* vs. *Bishop of Winchester*, Hob. 224, Lord Ho-
bert, speaking of this statute, says, " As touching the mean-
" ing of the statute, to this purpose: The purposes of these
" statutes were to establish conveyances to and from the king,
" according to natural equity, ' secundum equum et bonum,'
" which is ' lex legum,' without respect to legal ceremonies ;
" but it was never meant to enable those persons, or their
" grantees, who by natural defects or disablements were, eith-
" er by the law of nature or by the law of the *land, disabled
" to grant ; and therefore, if an idiot, lunatic, or an infant un-
" der seven years of age, had made a grant to the king, this
" statute had never made these good, for 'jura naturæ sunt
" immutabilia.'

" To conclude, as this statute doth not confirm a grant made
" of that which is not the grantor's to give, so these weak
" persons are owners of the lands, to hold and retain to them-
" selves, but are esteemed in law as not owners to give them
" away ; and therefore it was a needless explanation in the
" statute of wills, that idiots and the like should not be ena-
" bled to devise.

" The objection that was inferred out of the saving of the
" statute, where wives were excepted, that therefore they
" were meant to be bound, moves me nothing ; for (besides
" that it is a weak, implicit, and indirect inference to let in so

*Page 193.

Drury<br>v.<br>Drury.

" great an absurdity and incongruity of law,) that exception
" doth not reach unto the· wives that are parties, that is, to
" such as join in the grant of their own estates; but to the
" wives of the parties to the grants, that is, having nothing
" but of the wives' title of dower, which being a small thing
" and casual, they were content to free the king's estate of:
" the words are, ' other than the parties, their heirs and wives ;
" so they put the wife in rank with the heir."

The statute of wills being conceived in general words, the
34 Hen. VIII. takes infants out of those general words; and
though I concur with Lord Hobart in thinking that it was
not necessary to insert such an exception, because an act en-
abling persons to convey by a will, could never have been
construed to capacitate a person to convey, who could not
convey by deed ; yet the more unnecessary it *was, the more
strongly it fortifies the inference drawn from it in favor of the
extent of the general words in an act of parliament.

But many cases have been put, where the law implies an
exception, and takes infants out· of general words, by what is
called a " virtual" exception.

I have looked through all the cases ; and the only rule to
be drawn from them is this, that where the words of a law,
in their common and ordinary signification, are sufficient to
include infants, the virtual exception must be drawn from the
intention of the legislature, manifested by other parts of the
law, from the general purpose and design of the law, and
from the subject matter of it.

Whereas in the present case I will shew,

1. An intention to include them, from other parts of this
law, from the general view and design of it, and from the na-
ture of the claim which is to be affected by it.

2. That this act hath been expounded in such a manner,
soon after the making it, as to shew that the bar doth not
arise from the agreement of the woman to a jointure before
marriage, but from the energy and force of the act of parlia-
ment, substantiating the settlement against her for this parti-
cular purpose.

* Page 194.

Drury
v.
Drury.

3. That if it was doubtful, usage is the proper decider of that doubt; and that the usage has been in favor of this construction.

4. That there are the greatest judicial authorities for it; only one case, which passed "sub silentio," against it.

1. Most of the women of great families and fortunes were married under age; and the marriage of infants was given, or sold, like any other personal property. The legislature could not but know *that a multitude of wives then existing, had been married under age. The 16th section of the act proves decisively that it did arise in their minds; for that clause takes notice, for another purpose, of heirs being within age or of full age; which shews that these different periods of time were then in their contemplation, and infancy therefore must have arisen in their minds as well as coverture. Indeed, the idea of one disability cannot present itself to the mind of a lawyer, without the other. They are so connected together, and the consequences arising from both in many cases (not in all) are so exactly the same, that they will obtrude upon the imagination at the same time. And when there is a proviso qualifying the bar in a particular instance, it is really equivalent to saying, "we mean the bar should take place in all cases whatsoever, except in the instance we have expressly provided for." And the language of the law upon this subject is, that in all cases of statutes with provisos, they shall be taken generally, and in the most extensive sense in all particulars not restrained by the proviso, by force of the general words.

If they had not thought the general words would have barred femes covert in respect of jointures after marriage, it was a vain and useless proviso.

It was absurd and ridiculous to take persons out of the act, who were not in it; but the legislature, by this proviso, have in reality given their opinion upon this question—they have in effect said, "the general words will extend to jointures made upon persons under all kinds of disabilities; but as that is not our intention in respect of jointures made after marriage, we will take them out of the generality of the law, but leave

* Page, 195.

jointures.before marriage to bar dower in every other case whatsoever."

\* If it is said that this was only a clause of caution, the same caution which produced the proviso in favor of femes covert, would have extended to infant, in case they had meant to give the same election to both.

And Lord Hobart, in Shirley v. Wood, Hob. 71, understands the law in this manner. His words are, " The statute " of uses hath a general perview, that jointures made for wives, " without distinguishing before or after coverture, shall bar " dower; and then comes a proviso, that if it be made during " coverture, she may refuse it, and take her dower; which is " a kind of remedy provided for her out of the generality of the " law, and therefore must be pleaded by her;" that is, a feme covert is within the general words, and she must take herself out of the general words, by bringing her case within the proviso.

The case put by Dyer, in Plowd. 360, is very apposite to this case. The statute of fines, in 18 Edw. I. mentions infants, and not femes covert, which is the reverse of this case; and Dyer is of opinion, that because femes covert were not mentioned, they were bound by a fine and non-claim under that act.

This proviso relating to jointures after marriage, does not take a feme covert out of the enacting clause generally, as it would have done if it had said, provided this act shall not extend to femes covert,"—no; femes covert were the objects of the enacting clause. The bar was created and opposed to them by the designation of married women; and the proviso only removes the bar, at their election, in a particular case; and therefore, even in respect to jointures after marriage, femes covert are still within the general words to every purpose whatsover, but the special purpose †of making an election whether they will take their jointure or dower.

For suppose a jointure is made after marriage, and a woman accepts it, and brings a writ of dower; if she is not within the general words of the enacting clause, she must have both.

* Page 196. † Page 197.

Drury
v.
Drury.

To another purpose, a wife in respect of a jointure after marriage, is within the enacting clause ; for suppose she was to elect her jointure, and afterwards be evicted ; if she is not within the enacting clause, she is not within the proviso which immediately follows the enacting clause, and gives the compensation, viz. "provided that if any such woman be evicted, she shall have a compensation." What woman? Every woman having a jointure mentioned in the enacting clause, and no other ; and therefore, unless the enacting clause includes a woman in respect of a jointure after marriage, she could have no compensation out of the residue of her husband's estate, upon an eviction of all or any part of her jointure made after marriage.

If infants were not included in the general words of this law, they must have been entitled both to their settlements and dower ; for this is the only clause in the act which can take that common law right from them ; and if an infant elects a jointure made after marriage, and is evicted, she is not within the compensating proviso, unless she is within the general words of the enacting clause ; for it can extend to no other.

But to avoid that inference, which proves too much, it has been said that women may be so far included in these words as to prevent their being entitled to both their jointures and dower ; yet still it *must be understood to leave them to that right which the common law gives them, of disagreeing to these estates when they came of age ; that even before this act of parliament, they were not obliged to take the estates limited to them by these settlements, "ex provisione viri ;" and that it would be a most harsh and severe exposition of this statute, to take away a right which they had, of refusing those settlements.

But if they are included in the general words for one purpose, they must be included for every purpose to which the provision of that clause extends. And I do not contend that this clause takes away the right which infants have of disagreeing to their settlements after the death of the husband

* Page 198.

They might disagree to them after this act if they pleased, as they might have done before the act; but still the statute gives these settlements the energy of a bar.

It was the existence of a settlement made before marriage at the time of the act, and of a settlement made before marriage since the act, which constitutes the bar within the meaning of this act of parliament.

If the settlement existed at the time, the bar attached the instant the act passed. The right of dower was that moment annihilated, as to all women who were then living, and had jointures made before their marriage. To this purpose the statute impregnated the settlement with the quality of a bar, which could not be varied either by accepting or refusing the settlement afterwards.

And when a settlement was made after the act, before marriage, the right of dower never arises. The statute interrupts the right; there is no inchoation of it by the marriage. In that particular, it *is a repeal of the law of dower; it is saying that a marriage so circumstanced shall have no effect, " quoad dotem ;" it is as much a plea in bar, as " never coupled in lawful matrimony."

But it may occur, that a jointure, when refused, is void " ab initio ;" and therefore, that the wife, in that case, is not a woman having a jointure, when she claims her dower.

When an estate is refused, it does not become void to all intents and purposes, as if it had never been. For suppose an estate conveyed to a feme covert, or an infant, and the grantor afterwards makes his will, and devises it, and the feme covert or infant afterwards refuses ; the will of the grantor will not be good. Butler and Baker's case, 3 Co. 25.

But suppose it was void at common law, yet a statute may give it a being and effect for a particular purpose, and at the same time leave it, for every other purpose, to all the consequences which it would have had if the act had never been made.

If she had a jointure when the act passed, or, since the act, has a jointure at the time of the marriage, and may take that jointure if she pleases ; the act has drawn the line upon her,

* Page 199.

and says she shall have no choice. For the act is not, " every widow having a jointure when she demands her dower ;" but, " every woman married, having such jointure made or hereafter to be made." And a jointure which had been limited to an infant before marriage, was a jointure made, and so effectually made that she could not disagree to it till her husband died; and in that respect, differs widely from a conveyance made by an infant of her own estate, which she may avoid at any time.

*All books which treat of dower, speak of it as an inchoate, inceptive, initiate right, given by the marriage, and consummated by the death of the husband.

The death of the husband does not give it, but completes it ; and if a settlement before marriage prevents the right from ever beginning, the death of the husband cannot consummate what never began ; much less a refusal, which must be posterior to the death of the husband.

The case, put at the bar, of a fine levied of a jointure made before marriage, and of one made after marriage, is in point to shew, that the bar is created by the settlement in the one case and by the acceptance of it in the other. If a fine is levied by husband and wife of a jointure made before marriage, the wife cannot ⌐claim dower in the residue of her husband's estate ; but if it is levied of a jointure made after marriage, she may.

What is the reason of the difference ? Because the right of dower had never existed in the one case, but it had in the other ; and nothing could bar it but acceptance, which could not be till after the marriage, and then there was nothing to accept.

And is it to be conceived, that when the legislature was forming a law of such importance to the public, which was to be, and really has been, and now is, the basis of all the real property in the kingdom, and they were considering the consequence of that law in respect of married woman, (and in the case of women, married infants must have occurred,) they should leave so many married women upon a virtual excep-

* Page 200.

tion in one case, and guard them by an express proviso in another?

*It is very material to observe, that this act of parliament, even in its great and principal object, the union and consolidation of the legal estate and the use, takes into its grasp infants, as well as adult persons, in general words. The words are, " where any person or persons shall be seised to the use of any person or persons." Suppose the legal estate had at that time descended upon an infant, and the use at that time were in an infant; this parliamentary conveyance would certainly have taken place in such a case, exactly in the same manner as if they had been of full age, or an act had passed in any particular case enabling one infant to convey to another.

Upon what foundation would such a construction have been made? Because the words in their proper and ordinary signification comprehend infants; and there was the same reason to unite the legal estate and the use in the case of infants, as of adult persons.

But it may occur, that in such a case there could be no prejudice; it was only vesting the legal estate where in equity and conscience it ought to be.

Answer: 1st, It shews that the act was dealing with infants by general words; 2d, That no prejudice could arise to infants, by giving their settlements the effect of a bar, which the legislature did not intend in the case of adult persons.

What was the reason of making a jointure before marriage bar dower, and not letting dower bar the jointure? They found an infinite number of estates at that time under settlements, with limitations made by husbands and their ancestors to wives in tail; because that was the strictest settlement which the law then knew.

† The injustice of repealing these settlements, which are domestic family laws, adapted to the circumstances and exigencies of every particular family, must have determined them in a moment not to lay the least foundation for breaking in upon them; and as they could be made from no other motive but a desire to secure a proper provision for wives surviving their husbands, the legislature saw there could be no hardship in refus-

Drury<br>v.<br>Drury.

*Page 201.　　　　　†Page 202.

ing them a choice of dower in opposition to their settlements. And though dower in their husband's estate (even before the union effectuated by this act, but particularly after this act,) might, in some particular instances, be more valuable than the estates provided for them by these settlements; yet this inequality, in particular instances, was most amply compensated to the sex in general, by putting such an infinite quantity of property within the reach of dower, where no particular provisions had been made for them. "Nulla lex satis commoda "omnibus est; id modo quæritur, si majori parti et in summa "reprodest."

The rule laid down by the legislature was this: Let women, who have no settlement, take their dower in all their husbands' estates, whether those estates were vested in them before this act, or by this act; but let the women, who have settlements made before their marriages, acquiesce under those settlements, and abide by the provisions which have been thereby made for them, whether they are great or small, adequate or inadequate; whether they have been made by the agreement of themselves or their friends, or have been the mere spontaneous acts of the husband or his ancestors.

The objection of fraud, so much relied upon, does not exist, as applied to a settlement made before the act; for a settlement could *not be made to bar dower fraudulently, when it could not be made to bar it at all.

But (it is said) though it could not be made fraudulently to bar dower, yet the wife might have disagreed to the settlement, and have refused to accept the estate given to her by it.

It is a very foreign supposition, that an estate should be limited to her for a provision not worth her acceptance, when she could lose no other advantage by accepting it. But suppose it was "damnosa hæreditas," did the legislature mean to take away her right to disagree, and force the estate upon her "nolens volens?" Certainly not. She might agree or disagree to the settlement, just as she might have done before the act; but the bar which the act has given to the settlement before the time of agreeing or disagreeing comes, cannot be

*Page 203.

avoided by her refusing to accept it. It is the will of the legislature, acting upon settlements then existing, which constitutes the bar, and not the agreement to those settlements.

Suppose instead of making these settlements a bar of dower, they had given women a right to elect, to take which they would, what would have been the consequence? it would have put it into the power of every woman in the kingdom, where the estate was limited to her in tail, to have defeated the limitation to the issue, and thereby to overturn the strictest settlements which were then existing, or could then have been made: for she could not refuse for herself only; because the estate tail being to vest in her, either totally or not at all; if she refused to accept the estate tail, it must vanish as to the issue; and wherever the dower was more valuable than the estate limited by the settlement, she would have been balancing the difference, and tempted to make an election of her *dower; and the issue who were purchasers for a valuable consideration under their father, as well as their mother, must have lost the estate.

To illustrate my meaning by an instance : By a settlement before marriage, an estate stands limited to the husband and wife, and to the heirs of the body of the wife by the husband to be begotten, leaving the reversion with the husband. The husband sells the reversion, or limits over to his brothers, or other collateral branches of his family, and dies, leaving issue. The wife surviving, says, " I was an infant when this settle- " ment was made, and therefore I will refuse the estate given " by this settlement, and have my dower out of the whole " estate." What would have been the consequence? The issue of the marriage would have been disinherited, and the estate gone to strangers, or to the collateral branches of the family.

Did the legislature intend to leave this right in an infant any more than in an adult? When the settlement was made, it was thought to be a proper provision.

Women may accept or refuse their jointures as they please; but if they do refuse them, they shall not have dower; and when that temptation was taken out of their way, there was

no danger of their defeating the limitation to the issue of the marriage by a refusal.

It is said that the motive which induced the legislature to give femes covert an election, in respect of jointures after marriage, was because they were "sub potestate viri," and incapable of contracting; that infants are equally incapable, and therefore ought to have the right of election.

That is saying in so many words, that a person to whom no right is given by the act to elect, shall be in the same situation as a person *to whom a right is given by the act to elect; which is in reality to destroy the distinction which the proviso in this act has made and established.

Suppose the incapacity of contracting to be the reason for giving an election in the case of jointure after marriage, and this objection had been made at the time of passing the act. "You give femes covert a choice as to jointures after mar-"riage: why do not you give infants a choice as to jointures "made before marriage? They are equally incapable of con-"tracting." The plain and obvious answer must have been, "The cases of an infant before marriage, and of a woman af-"ter marriage, differs most essentially: a feme covert is un-"der the absolute control of her husband; he would be con-"tracting with himself. The principal contract, the marriage, "is past; and by that marriage the wife has acquired an in-"ceptive right of dower, which he shall not take from her. "But an infant is not under the control of the man, before "she has married him. She is under the control of her pa-"rents or guardians; and though a marriage without their "consent cannot be rescinded, yet the law expects and re-"quires their consent, and punishes all marriages contracted "without it."

"Settlements are made by the interposition of parents and "guardians. They are the persons whom the law appoints to "direct the infants in these stipulations, and to oppose to the "intended husband. 'Ad ea quæ frequentius accidunt, jura "adaptantur.' A marriage, without their consent, would not "have entitled the wife to dower; for though the ecclesiasti-"cal law did not rescind the contract, because it could not re-

* Page 205.

" store her what she had lost by the execution if it, yet the " bishop would not have certified such a *marriage to be ' le- " gitimum matrimonium.' It was not a contract to affect a " right which she then had, as is the case of a jointure made " after marriage ; but it is a contingent right merely, which " she is to derive through a contract, which the law enabled " her to make. Her own estate is not affected by it."

" Conditions, express or implied, bind infants. This is a " kind of condition annexed by the husband to the disposal of " himself. If she takes him, she ought in justice to abide the " terms on which she accepted him ; she ought not to retain " the benefit of the contract, and then reject the condition up- " on which the husband entered into it."

" We find an infant competent to the principal contract ; " and therefore will consider her competent, as to this prece- " dent contract, which induced the husband to enter into it."

" By giving the wife a right of election in the case of a joint- " ure after marriage, we leave the husband's estate exactly in " the same situation as when the settlement was made, sub- " ject to the right of dower which the marriage had given ; " but by giving a right to elect dower in the other case, we " should subject the husband's estate to a right which it was " not subject to when the settlement was made, and which he " might have effectually prevented at that time, either by not " marrying her at all, or keeping his whole estate out of the " reach of that right. And the law makes an essential differ- " ence between the privilege of infancy' in respect of rights " vested in infants, and a title to things which never were vest- " ed in them."

If an infant had title to enter for mortmain, and did not enter within the year ; or if he did not enter into lands purchased by his †villein before the villein had aliened them ; he could not enter afterwards in either case; for there he had nothing but a title to a thing which never was in him. Plo. 364, b.

Though the common law says, " that persons must treat " with infants at their peril, because they will be bound by the " contracts they make with them, and infants retain their right

---

* Page 206.          † Page 207.

Drury
v.
Drury.

" of avoiding them ;" yet that regards only contracts affecting their own original property, not meaning that they should derive an interest out of the property of another person. It would be a fraud upon the husband ; and the case cited at the bar out of 2 Leon. 108, *Piggot* v. *Russet,* is a strong instance that infancy shall not protect a fraud, and that an infant may, by his own assent, preclude himself of a contingent right, even in his own inheritance, viz : " If tenant for life, being of full age, " and he in remainder within age, levy a fine, and afterwards " the infant reverses the fine as to him, for the inheritance, he " shall not enter for the forfeiture, because he joined in the " fine, and so assented to it."

Upon what principle does this case stand ? If a tenant for life, levy a fine, it is a forfeiture ; and when the tenant had reversed it, it was totally void as to him, " ab initio," and as if it had never existed ; and yet the same reason might have been urged which is offered in the present case.

He could not preclude himself of this right of entry for the forfeiture. The law gives him as good a right to enter upon such an alienation, as if the tenant for life had died. It is a contingent right which every reversioner or remainder-man has in the estate ; and an infant can by no act prejudice such a right. But the common *law says, he shall be bound by his assent, as he had been a party to the act under which he would derive his right.

I have not been considering what the law would have been independently of this act of parliament, but mentioning such reasons as distinguish the case of an infant, before marriage, from a feme covert, and shew the justice of the legislature in making a difference between infants jointured before their marriage, and women jointured after their marriage, and opposing the bar to one and relaxing it in favor of the other.

The difference arises from the different situation the parties were in at the time of making these settlements.

The legislature would not take away a right which the wife had acquired by her marriage ; but they would hold her to a settlement made, when she had no right at all.

*Page 208.

It may perhaps occur, that a right of election is given to waive a settlement after marriage, and yet a settlement after marriage could no more be fraudulent before the act, than if made before the marriage; and the right of the issue may be defeated by an election of dower in that case as well as the other. It is true it could not be fraudulent; but it differs widely from a settlement before marriage in another respect. By a settlement before marriage, the issues of the marriage are purchasers for a valuable consideration under their father's marriage, as well as their mother's; but in case of a settlement made after marriage, the settlement is merely voluntary, and the issue not entitled to the same protection.

Perhaps it may be said, that though a settlement could not have been made fraudulently before the act, yet it might after the act.

*If this objection of fraud had any weight in it, which I shall shew it has not, it might have been a reason for laying down different rules as to jointures then made and afterwards to be made; but it cannot warrant us to lay down two rules, when the act has only laid down one.

I must repeat the position again in this place: that this case must be determined exactly in the same manner as if it had been the case of an infant married at the time of the act; and then how would the argument have stood? The possibility of a fraud to come, shall defeat a settlement made when there was no possibility of any fraud at all.

This leads me to the case of a pocket jointure, or a jointure made fraudulently to bar dower, which seems to have been the most plausible objection in this case; but when it comes to be examined closely, will appear not to have the least weight in it; for a jointure made fraudulently, to bar dower, is not the jointure which the law acknowledges and sanctifies. It must be a "competent livelihood of freehold, for the life of the wife." The pattern and model of the jointure to be made, is given by the act. It must be such a jointure as was made before the act. What was that? A jointure without fraud; because a jointure before the act could not have the least shade of fraud in it.

* Page 209.

A copy after that original is what the law means by a jointure. But can the common law examine this fraud? Competency is a very vague indefinite term. How is the line to be drawn with respect to this competency? How! as in all other cases whatsoever; by a jury, under the direction of the court which tries it.

*The circumstances of the parties, their rank and quality; the proportion of the jointure to the quantum of the whole estate; the consent of parents and guardians in ascertaining it; and every fact which shews the transaction fair, and every fact which shews it fraudulent, must be laid before the court to direct their judgment upon it.

A pocket jointure, made upon a woman without her privity, or upon an infant with her privity, without the interposition of parents or guardians, would be such an evidence of fraud, as would be sufficient to condemn it; and it is not without a precedent in the common law, that the validity of the act of an infant should depend upon the fairness of it; for if an infant makes a partition, and it is equal, it will bind him; if it is unequal, it will not. Co. Litt. 171. The validity of the partition depends upon the fairness of it. A beautiful instance of the care the law takes of infants with respect to their own property, by making it the interest of the party who treats with them to do them complete justice.

The case supposed would want no trial at all; for it would be fraud apparent, like the case put in Hardres, 56, Attorney-General v. Shirt. " The king was entitled to one ton out of every ten tons of wine imported. A merchant imported nine tons and a half. The king demanded and had a ton. The court said it was fraud apparent, without proof."

It would be endless to enumerate instances where the common law takes notice of fraud, and annuls acts done from so vicious a motive.

If the common law had not strength and activity enough in it to condemn an act founded in iniquity, it would ill deserve the character †Lord Coke gives it, who says, " that it has been fined and refined by an infinite number of grave and learned men, and is the perfection of human reason;" where-

* Page 210.                    † Page 211.

as, if it was incompetent to such question, I should think it had been fined and refined out of all its spirit, and was the corruption of human reason.

I will mention two or three cases upon this head, and allude to twenty. 3 Co. 77, Fermor's case. A lessee for years, and at will, of freehold estates, and also a copy-holder of lands lying in the same town, had also lands of inheritance lying in the same town ; and by a deed he conveyed all the leasehold and copyhold lands to a man for his life, and then levied a fine of so much land in quantity as would comprise the leasehold and copyhold, as well as his own inheritance, by covin and practice to bar the lessor of the inheritance of the leaseholds and copyholds. Five years elapse, and the lessee continues in possession, and keeps paying his rent to the lessor. The grantee of these estates dies, and the lease for years expires, and the lessee would then have set up the fine, and five years non-claim, to have barred his lessor. The book says, that the case being of great importance and consequence, was referred to all the judges ; and what did they say ? Though the fines are the general assurances of the realm, and the act of Hen. VII. has declared that they ought to be of the greatest strength ; yet the legislature never intended to establish a fine levied by fraud and practice, and therefore it was held no bar, by all the judges. The statute of Hen. VII. intended to make a fine and non-claim a complete bar ; but not a fine levied fraud-uently to cheat people. *So this statute intended to make a jointure a complete bar ; but it must be a jointure to support and maintain a wife, and not a jointure made fraudulently to cheat and starve her.

In Fermor's case, there is a variety of instances where the common law takes cognizance of fraud, and avoids almost all kinds of acts when they are infected with that poisonous ingredient.

A person in custody for felony may, before conviction, " bona fide," and for a valuable consideration, dispose of his personal estate. A person in that situation made a bill of sale of his goods, to make a provision for his son. He was afterwards

* Page 212.

convicted, and the sheriff seized the goods contained in the bill of sale, as forfeited.   The son brought an action against the sheriff for the goods ; and Holt, chief justice, said, that there was a fraud at common law, in such a case as that was ; and that such a conveyance could not be intended to any other purpose than to prevent a forfeiture, and defraud the king. So I say, in Holt's words, that such a conveyance, as has been supposed at the bar, cannot be intended for any further purpose than to defraud the wife ; and I will only mention one other instance where the law controls very legal acts, if the manner of obtaining them has been fraudulent.

An assignment of dower by a disseisor shall bind ; but if the widow hath colluded with the wrong-doer, it shall not, because the covin shall suffocate the right, and so the wrongful manner shall avoid the matter that is lawful.   Co. Litt. 35, a. But perhaps it will be asked, how is this fraud to be come at ?  Is there any precedent to be be produced of deducing such a question *of fraud before a court of law ?   No such case has ever yet existed ; but when it does exist, a way will very easily be found to get at it.   Pleading is only telling with accuracy and precision what the law is ; and if the law says an act done to defraud ought to have no legal effect, there seems to be no great mystery in saying so, either by a special plea, or upon some general issue.   For instance, a writ of dower is brought, the tenant pleads a conveyance made before marriage of particular lands to the wife for her jointure. The plaintiff might reply, that it was made by fraud ; and upon a general issue of " fraud or not fraud," the whole might come before the court, under such an issue ; or the plaintiff might reply the several facts which evidence the fraud, and the case be brought before the court upon a demurrer.   But taking the case put in its fullest extent, it is doing no more than what is practised every day in effect, by putting the estate into trustees, and taking joint purchases after marriage to prevent dower ; and a strict settlement made before marriage, with a power of revocation, will prevent dower, and, at the same time, preserve to the husband an absolute dominion

over the estate; and therefore, all the objection of prejudice to infants, as the law now stands, vanishes in a moment; for what detriment can it be to infants to prelude them from dower, by a small estate, when they may be equally precluded from it without giving them any estate at all?

Another reason against giving a right of election to a woman when she came of age, is, that the right must remain in suspense until that time, both in the case of a jointure made upon an infant before marriage and after marriage. *For suppose the husband dies, leaving an infant wife; she brings a writ of dower, and the jointure is pleaded in bar, and infancy is replied. She is not to have both; which is she to have during her infancy? If the jointure is good, and bars till disagreed to, there must be judgment against her in the writ of dower; and if she disagrees to jointure, and avoids it, "ab initio," how is she to get at her dower when she comes of age? For there is a judgment in dower against her. And if she does not sue a writ of dower, but takes possession of her jointure, is the right of dower said to be consummated by the death of the husband, to be turned by a construction of this act into a contingency, and lie in suspense till the infant comes of age, and be totally uncertain whether it shall ever exist at all? This question is determined in a book published in the year 1632, called the "laws and resolutions of women's rights." There is a section in that book with this title: What is a sufficient refusal or agreement of or to a jointure made after coverture?" And there the case is put: "If she bring a writ of dower and declare upon it, this is peremptory, although she be under age, covert or not covert of a second husband; for the law saith, that they which have discretion to acquire and get things, have sufficient discretion to give and preserve those things gotten. Therefore, if an infant come to any thing by purchase, he shall not in that have any advantage, or be in better plight than a person of full age." And the same book enumerates many instances of infants being bound by their own elections.

* Page 214.

Drury
v.
Drury.

An estate to an infant of two acres, the one for life, the other in fee ; feoffment of one, though under age, is a sufficient election.   * If rent be given to an infant, and he bring writ of annuity, his election is determined, and he shall not avow as for a rent when of full age.

If infant recovers debt, and sues an execution by elegit, it shall bind him.

And when Littleton, who is so very correct a writer, says, sect. 41, that if after the death of her husband, the widow enter and agree to dower, " ad ostium ecclesiæ," or " ex assensu patris," then she is concluded claiming any other dower ; it must be intended of an infant, because in the section next but one preceding, where he does not intend to include an infant, he expresses himself, and correctly says, "where a man of full age endows ;" and in 47th section, he puts the case of a man seised in fee simple, being within age.

The different form of pleading a jointure made before and after marriage, is extremely material to prove that it is the act of the husband which makes the bar in the one case, and the subsequent agreement of the wife which makes the bar in the other. Where the jointure is made after marriage, and is pleaded in bar of dower, there is an averment that she accepted it ; but when the jointures is made before marriage, acceptance is not pleaded at all. In the case in Co. Ent. 172, the wife is not so much as a party to the deed of jointure ; and she is so far from availing herself of her not being a party or privy to the deed, that she replies there was no such deed ; which is an implied admission, that if there was such a deed, she was bound by it. In Brownlow, [181, acceptance is not pleaded. " Doctrina placitandi," 149. " If an estate is made to the wife, before the " coverture or afterwards, (if she, after the death of her husband, enter and † agree to it,) for the term of her own life, or for a greater estate, this is a bar." These rules are exacted out of legal principles, and are the pith and marrow of the law. The entry and agreement, after the death of the husband, can relate only to the estate

* Page 215.        † Page 216.

made after marriage; because in the case of an adult agreeing to a jointure before marriage, it is admitted that acceptance after the husband's death is not necessary. And as the rule is laid down generally, it must be understood as generally to comprise an infant as well as an adult, or otherwise so accurate a book as that is, would have taken the distinction.

2d. I will now shew that this act has been expounded in such a manner as to prove that the lien or bar doth not arise from the agreement of the woman; but from the energy and force of the act of parliament, substantiating the jointure made by the husband.

Between the 27 Hen. VIII. and 13 Eliz. which was about the space of thirty-five years, it appears that it had come in question before the judges, whether a woman could refuse a jointure made before marriage?

In Plowden, 396, Lord Leicester's case, which was in the 13 Eliz. (before Vernon's case, which was in 14 and 15 Eliz.) Anderson says, " The act of 27 Hen. VIII. c. 10, which en-
" acts that women shall not have dower where lands were as-
" sured to them and their husbands for a jointure, has a pro-
" viso, that if any feme has lands assured after marriage to
" her for life, that then such feme may, at her liberty, after
" the death of her husband, refuse to have and take the lands
" so assured to her for her jointure, and demand her dower.
" And because that the words are 'assurance after marriage,'
" *it had been taken, that if the assurance be before marriage,
" that she shall not refuse; for by the implication of the
" words, the judges have taken the intention of the makers of
" the act to be so."

In what case, or how long before that time, the judges had put that construction upon the act, does not appear; but it must have been in less than thirty-five years since the making of the act.

This question, and the determination upon it, must have arisen upon a case where the woman had not previously accepted the jointure; for if, previous to the marriage, she had accepted it, no question could have arisen whether she was

* Page, 217.

bound by it. It could never be a doubt whether she could refuse what she had once accepted. And though this is to be understood of a woman of full age, yet, if the agreement of a woman of full age is not required by the law to constitute the bar, the argument drawn from the incapacity of an infant to agree, or the privilege of an infant to disagree, falls entirely to the ground.

4. Co. 3 a. Vernon's case. It is said, "that a woman can-"not, after the death of her husband, waive a jointure made "before marriage, and this by force of the proviso." And 1 Inst. 36, b. Lord Coke lays it down, that a jointure made before marriage, was not waiveable at all.

And the position is echoed through all the books which speak upon this subject, so emphatically, that it must be meant of a jointure which had not been previously accepted; for there was no occasion to raise judges from their graves to tell us, that a woman could not refuse what she had once accepted.

*But suppose the construction only doubtful, what is the rule? Usage is the best decider of the doubt. "Optimus legum interpres est consuetudo." Where the penning of a statute is dubious, long usage is a just medium to expound it by. Lord Vaughan, 169.

3d. As to the opinion of the conveyancers of the present age, though as able as any who ever lived, yet it has not been laid before us with that certainty which it ought to be, if our judgment were to be directed by it.

I prove the opinion of conveyancers for two centuries by this medium: it is now about two hundred years since the statute of Hen. VIII. was made. That jointures have, in fact, been made upon infants before marriage, ever since the statute, and for many years past under the direction of the court of chancery, is a fact too notorious to be disputed. Every great family in the kingdom is in possession of such settlements; and yet there is not one single instance where they have ever been disputed.

In some instances wives might die before their husbands: in others, the jointure might be more beneficial than the dow-

* Page, 218.

er; but there must have been many hundreds where it was otherwise : and if it could be conceived that there never has been an instance where the jointure has been of less value than the dower, there is no reason to disturb the usage, from the apprehension of a fraud which has never been practised.

If there have been instances of jointures inadequate to the dower which wives would have been entitled to, and those jointures have * never been rejected, and dower resorted to, it shews the sense of two centuries upon the question.

The practice proves the opinion; and the uninterrupted acquiescence under the practice proves the rectitude of the opinion.

4th. As to authorities, the cases of Price and Seys, (a) and Harvey and Ashley, (b) are in point : I heard them both, and took a very particular note of the latter, (c) but for fear of

(a) Barnard ch. ca. 117.          (b) 3 Atk. 607.

(c) The following note of this case of Harvey vs. Ashley, is taken from Mr. Justice Wilmot's MSS. Harvey, and Dorothy his wife, against Ashley and his wife, and others. The plaintiff, Dorothy, being fifteen years of age, and entitled to £5,000 under her grandfather's will, if she married with the consent of her mother, and to other contingent and future provisions, married Mr. Pitfield, her cousin-german. Previous to the marriage, a settlement was made, dated 29th of June, 1737, between Mr. Pitfield, Mr. Ashley and his wife, the trustees, and the young lady, Dorothy, whereby Mr. Pitfield's estate was settled in strict settlement, the other part being already settled; the £5,000 is agreed to be paid, and to be applied to exonerate a part of Mr. Pitfield's real estate; there was also a contingent provision of £3,000, which Dorothy was entitled to, and agreed that one moiety should be paid to Mr. Pitfield, and the other moiety sold : And an agreement was also made for settling another part of Dorothy's personal estate, which she was entitled to under the will of her grandfather; the £5,000 was paid, and £4,000 more of her personal estate was applied in paying off the incumbrances, affecting the estate of Mr. Pitfield. There was issue only one child of the marriage, Mary, an infant; in August, 1740, Mr. Pitfield died. December, 1740, Dorothy married Harvey; June, 1743, attained 21; 10th January, 1745, the bill was brought to set aside the marriage settlement, and for other purposes.

"Lord Chancellor : (Hardwicke.)

"The first point is, whether the plaintiff Dorothy, and Mr. Harvey in her "right, are bound by this marriage settlement, by the original nature and "force of the agreement taken abstractedly.

"The first objection is, that Dorothy was an infant, and could only be bound "by her election, and that no other persons could bind her properly by their

* Page 219.

any mistake, I have \*the notes taken of those cases by the late Lord Chief Justice Ryder, whose judgment, accuracy and fidelity to his clients, were as eminent as in any advocate who ever yet existed.   And in the case of Price and Seys, he

" contract.  But marriage agreements differ from all others.  The principal " contract is the marriage; and an infant female may contract at the age of " twelve.  All other parts of the contract are collateral incidents, entered into " to secure some provisions for the party marrying and the issue, and may be " greater or less, according to circumstances.

" As soon as the marriage takes' place, the principal contract is executed, " cannot be set aside or rescinded; the state and the capacities of the parties " are changed, and children born, or to be born, are purchasers under it; pur- " chasers both under their father and their mother; therefore, it was admit- " ted by Mr. Wilbraham, that the court would take care how they broke in " upon settlements, made on the marriage of infants; because the principal " contract being good and not rescindable, it may affect the issue of the mar- " riage, and the rights of third persons to avoid them.  On this ground it is, " that the difference has always been observed between the execution of other " agreements in specie, and of marriage settlements.

" Other agreements are entire; if either party fail, no execution ought to " be in specie; but in marriage agreements, though the father or mother, or " the friends of either, do not perform them, the children are entitled to call " for a performance from the other party, because they are purchasers from " both; the court may lay their hands on the father's or mother's estate, or " interest in the thing settled, to make it good.

" But if this court should interpose to set aside, or give relief against any " part of a marriage settlement, it must relieve against and avoid the ,whole : " for every part makes the consideration of the whole of every thing : and it " is impossible, where there is no fraud, so say this part is unreasonable ; you " have gained too much on one side, and therefore that shall be deducted. " This makes it a different bargain, and, in consequence, the uses of the es- " tate must be broken in upon on the other side.  Nay, in the present case, " the interest of the plaintiff, Dorothy, may be greatly concerned.   If she takes " back any part of her fortune, she must waive and renounce her jointure, and " the limitation of the fee to herself.

" Consider what may be the consequence : the mother dies, her second " husband becomes entitled to the moiety of the surplus of the grandfather's " property in her right, (now settled) which he may dispose of as he pleases, " and she may be stripped both of jointure and portion.

" The law has entrusted the father (or guardian) with the marriage of his " children ; but they ought not to use it to their disparagement.  Suppose he " does it fraudulently and corruptly, is the agreement therefore to be set " aside, or broken in upon, or the children not to have the benefit of what is " stipulated ?  By no means; but the guardian may be compelled to make " satisfaction, or the husband, if he is party to the fraud.

\* Page 220.

Drury
v.
Drury.

states, that the point was argued at the bar, and that the lord chancellor, (Hardwicke) said, " it was clear in law, that if a man married, and before marriage, in consideration of it, *and of her portion, makes a jointure on his wife ; though she was

" In the case of a father : if a child has a fortune independent, and the father " disposes of the child in marriage corruptly, and takes an advantage to himself, " this court would relieve against the father. On this ground depend the cases " of relief against private clandestine agreements made in fraud of the public " open agreements.

" But this case comes within none of these reasons of disagreement : cousin-" german—heir male of her mother's family—a natural match to desire—no " pretence of any corruption, fraud or ill practices in the father or mother—no " lucrative advantage taken to themselves. On the contrary, every thing done " on their parts to advance the child. The mother consents to the marriage— " accelerates her right to the £5,000, and vests it immediately—confirms a " method to charge the father's estates with £3,000, of which, in the event, she " might not have been entitled to one shilling—this they leave, for the benefit " of her and her children, to disencumber the settled estate, and for the provi-" sion for the children.

" The second objection is, that they have not made so beneficial a bargain for " this daughter as they might have done. If it were so, is that a sufficient " reason for setting aside a marriage agreement ? The law has entrusted the " parents with the care of the marriage of their children ; there are many con-" siderations which may induce them, besides strict equality, or advantage " in settlements—inclination of the parties—rank and quality of the person— " convenience and propriety in families—bringing together and uniting different " parts of the same estate ; all these are proper reasons. The statute of joint-" ures is a strong evidence of the judgment of the legislature upon this point. " Jointure on an infant before marriage, though not equal to dower, is a good " bar. It is true that the greatest part of the provision for this lady arose " from her grandfather ; but was it ever thought that a father could not " effectually contract for the marriage of his daughter, and the disposing and " settling of her portion, though that portion arose from a collateral relation ?

" Most portions arise from settlements, of which the children are purchasers, " and not in the power of the father. No instance of a private act of parliament " applied for to settle such a money portion.

" Third objection. Suppose this might be done as to vested portions, because " they are in the power of the husband ; yet not as to contingent interests, be-" cause these are not in the power of the husband.

" I will not now enter into the question about the husband's power to dis-" pose of the possibilities of the wife. *Theobald and Duffay* goes a great way ; " but it would be very extraordinary and mischievous to say the father could not " do it. Many portions arising under marriage settlements of fathers are con-" tingent ; sometimes depend upon survivorship, and the contracts concerning " them are to prevent that absolute power the husband would have over them

* Page 221.

an infant, she cannot waive her jointure and set up her dower. So it is expressly laid down, 1 Inst. 37. Now in equity, where there is a settlement, in consideration of marriage, and of the wife's portion, consisting of securities, if the husband dies before they are got in, his executor shall have them, and not the wife. The husband would become a purchaser of the wife's portion : and his representatives *might compel her to assign those securities to them, though she was, at the time of the marriage, an infant."

" There may, indeed, be some distinction; for if there was any collusion in making a jointure, merely to bar her dower, and not to make a provision for her, suitable to her fortune and quality, these circumstances might alter the determination of a court of equity. The present case, indeed, is that of an ' agreement ' only for a jointure; but that will make no difference in equity, as things contracted to be done are considered as done, and marriage articles are usually, †in courts of equity, strongly supported ; the court will certainly compel the heir to perform them ; and the wife is considered as fully by them as by an actual jointure. This is agreeable to the reason of the case of Blow vs. Lady Hereford. 2 Vernon, 501."

In the case of Harvey vs. Ashley, Sir Dudley Ryder was counsel for the infant ; and the case of Price v. Seys being cited, he says, "As to Price v. Seys, the dower being barred

" when they became vested ; the objection relied upon takes its rise from the
" event having fallen out one way, that is, the husband dying before the con-
" tingency.

" But supposing Mr. Ashley had died during the life of Mr Pitfield, and no
" care taken or provision had been made about this share of the surplus. All
" agreements of this kind are made to prevent the power and right of the
" husband arising from the marriage ; and it would be most dangerous for a
" court of justice to enter into the question whether they are more or less
" beneficial for the infant. As I said at first, I know no precedent where a
" marriage settlement of this kind has been called in question in this court ; but
" cases have been, where agreements have been entered into by infants with
" the consent of their guardians, or by guardians on their behalf, which this
" court would not suffer to be broke in upon.

" As to so much of the bill as seeks to set aside, or otherwise break in upon
" the settlement dated 29th June, 1737, made on the marriage of Dorothy with
" Charles Pitfield, her former husband, let it be dismissed."

* Page 222.                    † Page 223.

is no more than the effect of the statute of jointures, which makes all jointures of infants, as well as of women of full age a bar." It is there taken for granted, by one of the greatest lawyers that ever was in Westminster Hall, that it was a set-tled point; and laudable as his zeal was for all his clients, yet the conviction of his own mind was so strong, that he did not make the least effort to control it.

The opinion which was given upon great deliberation, has been so fully stated already, I will not repeat it; and I take upon myself to say, that no man at the bar entertained the least doubt of the legality of that opinion.

As to the case of *Cray* vs. *Willis*, I cannot find any note of it taken by any body.(a)

(a) This case is very shortly stated in 9 Vin. Abr. tit. Dower, 2, 3, ch. 18. By the Register's book, it appears to have been as follows:

Jeremiah and Elizabeth Cray, infants, plaintiffs,
against
James Willis, Mary Cray, widow, and others, defendants.

The plaintiffs, as the infant children of Jeremiah Cray, deceased, filed their bill in the court of chancery, against James Willis, Mary Cray the widow and administratrix of the said Jeremiah, and others; stating, "inter alia," that the said Jeremiah Cray died 1731, intestate, possessed of real and personal estate, leaving the plaintiff Jeremiah his heir at law, and the plaintiff Elizabeth, his only daughter, (both infants;) the defendant Mary Cray, his widow, and mother-in-law to the plaintiffs; four brothers, (one of whom was dead,) and three sisters, all infants; and that the defendant James Willis had been employed by the intestate as his steward; and praying that the defendants Mary Cray and James Willis might account for the personal estate and rents come to their hands. The defendant Mary Cray, by her answer, admitted the relationship and that the intestate left her with child, which was afterwards born a daughter, named Mary Carne Cray; and stated that the intestate, before her marriage, (she being then under age,) by indenture, charged several of his real estates with an annuity of two hundred pounds to her for life; and after her death, upon trust, to raise a like sum yearly, and pay it amongst the children of the marriage; but that in the said indenture the same was not agreed to be in bar of dower; and therefore she hoped she should not be concluded thereby, but have her option, either to abide by the said settlement, or take her dower, whichever should appear most for her advantage. The defendant James Willis admitted his employment, and set out an account. The defendants, the infants, alleged that the intestate, as administrator "de bonis non" of their late father, possessed his personal estate to the amount of twenty thousand pounds. The defendant Samuel Cray alleged, that Elizabeth Cray, his late mother, gave the residue of her personal estate (of the value of seven thousand pounds,) to him and Hannah, his

Drury
v.
Drury.

*Sir Dudley Ryder was then solicitor general, and most probably in the cause, or at least must have heard it; and though very minute †in his notes upon every thing which passed in court, yet there is not the least notice taken of it in his note book. And if this point had been debated, or it had been considered as any authority, it is almost impossible to conceive that the two cases of Price and Seys, and Harvey and Ashley, should not have produced it.

It must have been a case which passed "sub silentio;" and though the answer mentions the wife being under age when the jointure was made, yet the reason insisted upon by the answer, as stated in the decree, was, "that it was not agreed to be in bar of dower; and she therefore "hopes she shall not "be concluded thereby, but have her option, either to abide "by the said settlement, or take her dower, which she thinks "most to her advantage." And neither the answer nor the decree puts her right of election upon her infancy. It seems to have proceeded upon an apprehension, that a jointure within the statute must be mentioned in the deed to be in bar of dower. But if such a construction had been given upon the maturest deliberation, it is not to be opposed against the opinion that has been cited.

---

sister, since deceased, and made them executors; but that they being infants, administration was granted to the intestate during their minority. And the cause coming on to be heard at the rolls, on the 14th May, 1734, his honor decreed and ordered, that the plaintiffs do bring an administration to John, Mary, Elizabeth and Hannah Cray, before the master, (Holford,) who was to see what claims the defendants had on the intestate's estate; and that the defendants, the widow and James Willis, should come to an account for the personal estate come to their hands, and that the clear residue should be divided into three parts, one to be retained by the widow, and the remaining two-thirds to be subdivided into thirds, whereof the plaintiffs should each have one, and the remaining third to be subdivided into thirds amongst the plaintiffs and the widow; and that the receiver should be continued, and pass his accounts annually before the master, who was to see what was the annual value of the estate; and when the same should be seen, the defendant Mary Crary was to make her election, before the master, whether to abide by her jointure of two hundred pounds a year, or waive it and take her dower; and if she should elect to take her dower, the master was to assign her her dower out of the intestate's real estates, and see what was due to her an account thereof, which was to be paid by the receiver out of the rents.

*Page 224.                    †Page 225.

As therefore the words and reason of the law, the manifest and clear intention of the legislature, (evidenced by the proviso,) the subject matter of the right springing out of a contract they were capable of making, all conspire to make the bar operate upon infants as well as adult persons; as it would check the most advantageous marriages they could make, if they were to have the election contended for; (for a jointure, fairly made, is a much more beneficial interest than dower; and if it is fraudulently made, there is strength enough in the common law to control it; and by a conveyance to trustees *before marriage, or by a strict settlement with power of revocation, the right of dower may always be defeated;) as the construction I put upon this act can never operate to the prejudice of infants, but, by enabling them to marry into the greatest families and fortunes in the kingdom, must frequently operate to their advantage; as this construction has been sanctified by the practice of two centuries, and the opinion of the greatest magistrates, I will conclude with a question asked by Camillus in Liby:

"Quæ ratio est expertis alia experiri?"

Mr. Baron Gould, Lord Chief Baron Parker, and Lord Chief Justice Pratt, delivered their opinions in the negative; Mr. Justice Bathurst, Mr. Baron Adams, and Mr. Baron Smythe, with Mr. Justice Wilmot, in the affirmative,(a)

(a) It appears from a MS. note of Mr. Justice Wilmot, that Lord Hardwicke and Lord Mansfield were of opinion with the majority of the judges; and that Lord Mansfield said, "The general question is, if Lady Drury, having the provision stipulated for her by her marriage articles, is not barred of her dower? That infants are not bound by their agreements, was never held universally any where in the world; by our laws, some bind absolutely, some are void, some are voidable. If the transaction were fair, a bargain and sale of lands by an infant for necessaries, would be good. If an infant pays money with his own hand, without a valuable consideration, he cannot get it back again; if he receives rents, he cannot demand them again when of age. What then is the agreement in this case, and what are the circumstances of it? It is an agreement in order to the infant's advancement; marriage is so. What sort of a marriage? With the consent of her father and guardian. Lady Drury was then near twenty one; there is no objection as to the fairness of the transaction. She had only two thousand pounds for her fortune; it

* Page, 226.

Drury
v.
Drury.

\* Whereupon, and upon due consideration and debate of what had been offered on either side in this cause.

It was ordered, that so much of the said decree complained of by the said appeal, whereby an account is directed to be taken of the personal estate, of the intestate, Sir Thomas Drury, &c. be affirmed, and that the residue of the said decree be reversed. And it is hereby declared, that the respondent is bound by the agreement entered into in consideration of and previous to her marriage with the said Sir Thomas Drury, and that the same ought to be performed and carried into execution; and that the respondent is thereby barred of her dower, and of any share of the said Sir Thomas Drury's personal estate, under the statute for the distribution of intestate's estates.

was an advantageous bargain for her at the time. Better terms may be obtained for infants, by parents and guardians, than when they are of full age. By much the greatest number of women and married infants; but they are not to be an instrument to defraud others----no difference if premeditated fraud, or it turns into a fraud. If the statute of Henry VIII. had never been made, courts of equity would have given relief; but I am most clearly of opinion, that infants are barred under that statute. That act was made for uses, not for jointures; this is a provision arising out of the general consequences of uses. Then consider the usage and transactions of mankind upon it. The object of all laws with regard to real property, is quiet and repose. As to practice, the greatest conveyancers---the whole profession of the law---Sir Orlando Bridgeman---Lord Nottingham---there was not a doubt at the bar in Harvey and Ashley. Mr. Fazakerly always took it for granted, that infants were bound. The usage began on a legal determination within thirty years after the statute. Marriage settlements would be totally subverted without the interposition of the legislature; and I concur with Lord Hardwicke in opinion, that no man living could draw such an act of parliament. I never will put such an exposition on the law, as to make it necessary to apply to parliament to rectify it."

\* Page 227.